# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 7** |
| **J & M SALES INC.,** *et al.,* | **Case No. 18-11801 (JTD)** |
| **Debtors.**[1] | **Jointly Administered** |
| | |
| **GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of J & M Sales Inc.,** *et al.,* | **Adv. No. _____** |
| **Plaintiff,** | |
| v. | **JURY TRIAL DEMANDED** |
| **MICHAEL FALLAS, INDIVIDUALLY AND AS TRUSTEE OF THE MICHAEL FALLAS LIVING TRUST DATED 1/19/05; ILANIT FALLAS, INDIVIDUALLY AND AS TRUSTEE OF THE ILANIT FALLAS LIVING TRUST DATED 1/19/05; J&M PROPERTIES, LLC; J&M PROPERTIES, L.P.; J&M PROPERTIES ONE, LLC; J&M PROPERTIES I, LLC; 449 S. BROADWAY, LLC; 445 SOUTH BROADWAY, LLC; 6717 PACIFIC BOULEVARD RE HOLDINGS, LLC; 6725 PACIFIC VENTURES, LLC; 4765 WHITTIER RE HOLDINGS, LLC; M M & J VENTURES, LLC; FORCE-FULTON** | |

---

[1]   The Debtors in these Chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: J & M Sales Inc., a Delaware corporation (4697); National Stores, Inc., a California corporation (4874); J&M Sales of Texas, LLC, a Delaware Limited Liability Company (5979); FP Stores, Inc., a California corporation (6795); Southern Island Stores, LLC, a Delaware Limited Liability Company (8099); Southern Island Retail Stores LLC, a Delaware Limited Liability Company (4237); Caribbean Island Stores, LLC, a Puerto Rico Limited Liability Company (9301); Pazzo FNB Corp. (9870), a New York corporation; Fallas Stores Holdings, Inc., a Delaware Corporation (6052); and Pazzo Management LLC, a New York Limited Liability Company (1924).

MALL, LLC; DATE PALM CATHEDRAL
CITY, LLC; 6300 MACK ROAD, LLC;
POMONA DEVELOPMENT, LLC; MJF
PROPERTIES LLC;  EPHRIHAM FORT
WORTH LLC; FORCE-501 EAST 6TH
STREET LLC; EAGLE PASS SOUTH
BIBB LLC; FORCE-100 S. ZARZAMORA
STREET LLC; 4010 EAST HIGHLAND
AVENUE LLC; 2602 SOMERSVILLE
ROAD LLC; 6895 SIERRA CENTER
PARKWAY LLC; 201 TOWN CENTER
WEST LLC; 409 NORTH LITCHFIELD
ROAD LLC; 1261 NORTH AZUSA
AVENUE LLC; 4613 EAST LANCASTER
LLC; 1467 COUNTRY CLUB DRIVE
LLC; 909 NORTH AVALON
BOULEVARD LLC; MACARTHUR
BOULEVARD LLC; RAMONA
BOULEVARD LLC; 840 SOUTH
ALVARADO RE HOLDINGS LLC;
SOUTH TORRENCE AVENUE LANSING
LLC; 580 NORTH 11TH STREET LLC;
WHITE LANE BAKERSFIELD, LLC;
1240 WEST MAIN STREET LLC;
FALLAS BORROWER I, LLC; FALLAS
BORROWER II, LLC; FALLAS
BORROWER III, LLC; FALLAS
BORROWER IV, LLC; CONWAY
STORES, INC.; CONWAY TWO LLC;
CONWAY THREE LLC; BRONX 152
OPERATING CORP.; CW OPERATING
LLC; METRO BUYING GROUP, LLC;
CW MANAGEMENT SERVICES LLC;
CONWAY MANAGEMENT LLC;
TRISTATE APPAREL INC.; CONWAY
RETAIL GROUP LLC; CATONSVILLE
RETAIL REALTY LLC; JACKSON
RETAIL REALTY, INC.; 181 RETAIL
REALTY INC.; UNION RETAIL
REALTY INC.; RENTAR RETAIL
REALTY CORP.; OLNEY RETAIL
REALTY CORP.; DARBY RETAIL
REALTY CORP.; ELIZABETH RETAIL
LLC; CHELTENHAM RETAIL REALTY
LLC; GREENBRIAR RETAIL REALTY
LLC; SEVERANCE RETAIL REALTY

LLC; FORD CITY RETAIL REALTY
LLC; CICERO RETAIL REALTY LLC;
HAMDEN RETAIL REALTY LLC;
CONWAY STORES OF SOUTH DEKALB
LLC; FAYETTEVILLE RETAIL
REALTY LLC; MORROW RETAIL
REALTY LLC; 501 ADAMS AVE
RETAIL (PA), INC.; CARTERET
DISTRIBUTION CO. INC.; CONWAY
FOUR LLC; CONWAY MIDWEST LLC;
CONWAY EAST LLC; HAIRSTON
RETAIL REALTY LLC; MADISON
RETAIL REALTY LLC; MORRIS
COHEN; ABE M. COHEN; JEFFREY
COHEN; ACTIVE USA, INC.; ONE STEP
UP LTD.; ALLURA IMPORTS INC.;
KNITWORK PRODUCTIONS II, LLC
D/B/A AMERICAN ATTITUDES; BABY
VISION INC.; BAMBOO JEANS CORP.;
BEN ELIAS INDUSTRIES CORP.; BLUE
STAR CLOTHING; BOBENS TRADING
CO. INC.; BRAHA INDUSTRIES INC.;
BRIARA TRADING CO.; CDB BRANDS
INC.; CHERRY STIX LTD; CHILDREN'S
APPAREL NETWORK LTD.;
CONSENSUS ADVISORY SERVICES,
LLC; CONSENSUS SECURITIES, LLC;
COUNTRY SILK INC.; CREATIVE
REALTY GROUP LLC; CUDLIE
ACCESSORIES LLC; DANBEE, INC.;
NOAH USA INC. D/B/A DAVIDA
FASHION; DREAMWEAR INC.; EHL
IMPORTS CORP.; ESTI COUTURE INC.;
FEINBERG REALTY ASSOCIATES,
L.P.; GINA GROUP, LLC; PREGER &
WERTENTELI, INC. D/B/A GOLD
MEDAL INTERNATIONAL;
GOLDSTONE HOSIERY CO. INC.;
GREENTOWN, LLC; HASELSON
INTERNATIONAL TRADING INC.;
HAVE FASHION INC.;  IAPPAREL,
LLC; INT'L INTIMATES INC.; ISAAC
IMPORT INC.; J CREATIONS INTL
LLC; JAYLYN SALES INC.; JCS
APPAREL GROUP INC.; JESCO
FOOTWEAR INC.; JULIUS YOUNG

3

HOSIERY INC.; JUST ONE LLC; LANY
GROUP, LLC; LATI FASHION
INTERNATIONAL INC.; LEONARD
FEINBERG INC.; LORENCY & CO.
LLC; LOLLYTOGS LTD. D/B/A LT
APPAREL GROUP; M.T. PACKAGING,
INC.; MAC LOGISTICS; MAVERICK
APPAREL LLC; NATIVE GROUP INT'L;
NEW YORK ACCESSORIES GROUP
INC.; NORTHPOINT TRADING, INC.;
PANTIES PLUS INC.; POETRY
CORPORATION; PG WEAR CORP.
D/B/A PRETTY GOOD; SARAMAX
APPAREL GROUP INC.; SASHA
HANDBAGS INC.; SEVEN APPAREL
GROUP; SIMEX TRADING CO.; SIMON
INTERNATIONAL TRADING CORP.;
STERLING NATIONAL BANK; THE
TIMING INC. D/B/A LA VIE 89;
TODAY'S APPAREL INC.; SKIVA
INTERNATIONAL, INC. D/B/A
TRENDSET ORIGINALS; TRI-
COASTAL DESIGN GROUP INC.; TUFF
COOKIES INC.; UNITY
INTERNATIONAL INC.; WICKED
FASHIONS, INC.; KC EXCLUSIVE INC.
D/B/A ZENANA; REICH BROTHERS,
LLC; FAME FASHION HOUSE, LLC;
MIRAGE FASHIONS OF NY, LLC;
MANGO USA, INC.; OMEGA APPAREL,
INC.; CHD HOME TEXTILES LLC;
ROSENTHAL & ROSENTHAL, INC.;
MIDDLEGATE FACTORS LLC; EULER
HERMES; COFACE; STEVEN SUTTON;
AND KEYBANK NATIONAL
ASSOCIATION,

Defendants.

## COMPLAINT

I. **INTRODUCTION**

1.      Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of J & M Sales Inc. ("J & M Sales"), National Stores, Inc. ("National Stores"), J&M Sales of Texas, LLC ("J&M Texas"), FP Stores, Inc. ("FP Stores"), Southern Island Stores, LLC ("Southern Island"), Southern Island Retail Stores LLC ("SI Retail"), Caribbean Island Stores, LLC ("Caribbean Island"), Pazzo FNB Corp. ("Pazzo FNB"), Fallas Stores Holdings, Inc. ("Holdings"), and Pazzo Management LLC ("Pazzo Management") (collectively, the "Debtors"), by and through his counsel, brings this action, *inter alia*: (a) to avoid the Debtors' assumption of nearly $46 million in liabilities owed by Conway Stores, Inc., a failing business which the Debtors bailed out by assuming nearly all of its debt (a transaction that substantively appears more like a stock purchase), and to avoid and recover the payments made by the Debtors to Conway creditors; (b) to avoid as fraudulent transfers nearly $67 million in above-market and/or excessive rent payments the Debtors made to various special purpose entities owned and controlled by Michael Fallas (who owned and controlled the Debtors), including phantom rent payments made to a Fallas-owned entity for a location at which the Debtors never operated a store; (c) to avoid certain other fraudulent or preferential transfers made to Fallas, his family, and trusts under their control, including large cash dividends and liens granted to Fallas; (d) to recover for Fallas's breaches of fiduciary duty, which include, *inter alia*, authorizing the Debtors' entry into the transaction with Conway and the self-dealing prioritization of his own interests (and the interests of other entities he owned and controlled) over those of the Debtors, the combination of which caused the Debtors to collapse into bankruptcy with claims and obligations exceeding Two Hundred Million Dollars ($200,000,000.00), for which Defendants Michael Fallas, Ilanit Fallas, trusts for which the Fallases serve as trustees, and the Fallas-affiliated companies named as Defendants herein are jointly and severally liable.

2.      Michael Fallas – unfettered by oversight from a functioning Board of Directors or managers (given that he and his wife were the sole board members and he was the managing member of the Debtor LLCs) – owned and controlled a vast enterprise of entities which functioned as alter-egos of the Debtors and through which he enriched himself at the Debtors' expense.  This enterprise included not only the Debtors, which operated a chain of discount retail stores selling clothing and other items, but also numerous non-Debtor special purpose entities which owned commercial real estate that was rented to the Debtors at inflated, above-market prices.  The Debtors and the Fallas-affiliated entities disregarded corporate separateness and were heavily reliant on one another to operate – with the Debtors functioning primarily as a cash cow for sustaining the enterprise and enriching the Fallas family.  Even after the Debtors experienced serious financial problems – to the point of insolvency – Fallas continued funneling cash out of the Debtors for his own benefit and the benefit of other non-Debtor Fallas affiliates.

3.      The Debtors' operational and financial decline began in earnest in May 2014 – when Fallas, without regard for the Debtors' interests and without conducting appropriate due diligence, plowed forward with an ill-advised acquisition of 78 Conway stores.  The acquisition – in connection with which the Debtors assumed substantially all of Conway's considerable debt, in exchange for a failing business worth a fraction of that amount – was little more than a bail-out for Conway's creditors (given that Conway was on the verge of bankruptcy at the time) at the expense of the Debtors.  Indeed, the Debtors later acknowledged that their descent into bankruptcy began with "overpay[ing] for [Conway] for ~$70 million . . . [and] assum[ing] [Conway's] financial debt and trade debt."  Ignoring the immediate and devastating financial effects of the Conway stores acquisition, Fallas authorized and caused Debtors to pay large dividends to himself and his family, along with inflated, above-market rent to Fallas affiliates.

6

4.      The ill-advised Conway acquisition, coupled with Fallas's continued use of the Debtors' funds as his personal piggybank, destroyed the Debtors and precipitated their filing for bankruptcy in August 2018.

## II.      JURISDICTION & VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

6.      The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does <u>not</u> consent to the entry of final judgment of adjudication by a bankruptcy judge.

7.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III.      PARTIES

### A.      The Plaintiff

8.      Plaintiff George L. Miller is the duly-appointed Chapter 7 Trustee of the Debtors' bankruptcy estates.

9.      On August 6, 2018 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the cases are being jointly administered under the caption *In re J & M Sales Inc., et al.*, U.S.B.C. D. Del., Case No. 18-11801 (JTD).

10.      On January 28, 2019, the Bankruptcy Court entered an Order converting the Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, effective as of February 4, 2019 (the "Conversion Date").

11.     On the Conversion Date, Plaintiff was appointed as Chapter 7 Trustee of the Debtors' estates.

12.     The Debtors were discount retailers of apparel, bedding, household supplies, décor items, and other value-priced merchandise.  Prior to the Debtors' bankruptcy filings, the Debtors operated 344 stores in 22 states and Puerto Rico, under various store names including Fallas, Fallas Paredes, Fallas Discount Stores, Factory 2-U, and Anna's Linens by Fallas.

13.     Prior to conversion of the Debtors' bankruptcy cases to Chapter 7, the Debtors sold 85 of their store locations to Pegasus Trucking, LLC ("Pegasus") (another entity owned and controlled by Michael Fallas), pursuant to the terms of an Asset Purchase Agreement dated October 4, 2018.  The Bankruptcy Court approved the sale to Pegasus on October 17, 2018, and the sale closed on October 19, 2018.  Following the sale to Pegasus and the completion of the Debtors' inventory liquidation sales in December 2018, the Debtors had no ongoing business operations.

**B.     The Defendants**

**1.     The Fallases**

14.     Defendant Michael Fallas ("Fallas") is an individual who resides at 607 Foothill Road, Beverly Hills, California 90210.  Fallas is sued individually and as Trustee of "The Michael Fallas Living Trust dated 1/19/05."

15.     Defendant Ilanit Fallas ("Ilanit") is an individual and the wife of Fallas who resides at 607 Foothill Road, Beverly Hills, California 90210.  Ilanit is sued individually and as Trustee of "The Ilanit Fallas Living Trust dated 1/19/05."

16.     Fallas, Ilanit and their familial trusts owned and controlled the Debtors.

17. Fallas was Chairman of the Board and CEO of Debtor National Stores, the largest of the Debtor entities.

18. Defendants Fallas and Ilanit Fallas were the sole directors of National Stores and of J & M Sales, the two largest Debtor entities, through which much of the Debtors' business was conducted.

19. While the Debtors' schedules misidentified Michael and Ilanit Fallas as owners in their individual capacities, Debtors J&M Sales, Inc., National Stores, Inc. and FP Stores, Inc. are in fact owned by Defendants The Michael Fallas Living Trust dated 1/19/05 and The Ilanit Fallas Living Trust dated 1/19/05.

20. Fallas also (a) owns and controls Pegasus, (b) is trustee of The Michael Fallas Living Trust dated 1/19/05, among other family trusts, and, (c) owns and/or controls the Fallas SPEs (except with respect to certain of those owned by or with his father) and other entities within the Fallas Enterprise, as described herein.

21. Ilanit, along with Fallas and their familial trusts, holds an ownership interest in each of the Debtors. Ilanit is trustee of The Ilanit Fallas Living Trust dated 1/19/05, among other family trusts.

22. At all times material hereto, upon information and belief, Fallas was the managing member of the Debtor entities which are limited liability companies.

## 2. Fallas SPEs

23. Defendant J&M Properties, LLC is a California limited liability company with a place of business at 15001 S. Figueroa St., Gardena, CA 90248.

24. Defendant J&M Properties One, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248. Upon information

and belief, Defendant J&M Properties One, LLC is the successor to Defendant J&M Properties, LLC.

25.     Defendant J&M Properties, L.P. is a California limited partnership with a place of business at 15001 S. Figueroa St., Gardena, CA 90248.

26.     Defendant J&M Properties I, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.  Upon information and belief, Defendant J&M Properties I, LLC is the successor to Defendant J&M Properties, L.P.

27.     Defendant 449 S. Broadway, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

28.     Defendant 445 South Broadway, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

29.     Defendant 6717 Pacific Boulevard RE Holdings, LLC was, at all times material hereto, an Alaska limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

30.     Defendant 6725 Pacific Ventures, LLC was, at all times material hereto, an Alaska limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

31.     Defendant 4765 Whittier RE Holdings, LLC was, at all times material hereto, an Alaska limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

32.     Defendant M M & J Ventures, LLC is a Delaware limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

33.     Defendant Force-Fulton Mall, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

34.     Defendant Date Palm Cathedral City, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

35.     Defendant 6300 Mack Road, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

36.     Defendant Pomona Development, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

37.     Defendant MJF Properties LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

38.     Defendant Ephriham Fort Worth LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

39.     Defendant Force-501 East 6th Street LLC is a Texas limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

40.     Defendant Eagle Pass South Bibb LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

41.     Defendant Force-100 S. Zarzamora Street LLC is a Texas limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

42.     Defendant 4010 East Highland Avenue LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

43.     Defendant 2602 Somersville Road LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

44. Defendant 6895 Sierra Center Parkway LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

45. Defendant 201 Town Center West LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

46. Defendant 409 North Litchfield Road LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

47. Defendant 1261 North Azusa Avenue LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

48. Defendant 4613 East Lancaster LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

49. Defendant 1467 Country Club Drive LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

50. Defendant 909 North Avalon Boulevard LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

51. Defendant MacArthur Boulevard LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

52. Defendant Ramona Boulevard LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

53. Defendant 840 South Alvarado RE Holdings LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

54. Defendant South Torrence Avenue Lansing LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

55.     Defendant 580 North 11th Street LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

56.     Defendant White Lane Bakersfield, LLC is a Nevada limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

57.     Defendant 1240 West Main Street LLC is a California limited liability company with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

58.     Defendant Fallas Borrower I, LLC is a Delaware limited liability company formed in June 2018 with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

59.     Defendant Fallas Borrower II, LLC is a Delaware limited liability company formed in June 2018 with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

60.     Defendant Fallas Borrower III, LLC is a Delaware limited liability company formed in June 2018 with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

61.     Defendant Fallas Borrower IV, LLC is a Delaware limited liability company formed in June 2018 with its principal place of business at 15001 S. Figueroa St., Gardena, CA 90248.

62.     The Defendants identified in Paragraphs 23 through 61 above are referred to herein, collectively, as the "Fallas SPEs."

### 3.     Conway Sellers

63.     Defendant Conway Stores, Inc. (together with its affiliates, "Conway") is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

13

64.     Defendant Conway Two LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

65.     Defendant Conway Three LLC is a New York limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

66.     Defendant Bronx 152 Operating Corp. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

67.     Defendant CW Operating LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

68.     Defendant Metro Buying Group, LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

69.     Defendant CW Management Services LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

70.     Defendant Conway Management LLC is a New York limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

71.     Defendant Tristate Apparel Inc. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

72.     Defendant Conway Retail Group LLC is a New York limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

73.     Defendant Catonsville Retail Realty LLC is a Maryland limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

74.     Defendant Jackson Retail Realty, Inc. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

75.     Defendant 181 Retail Realty Inc. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

76.     Defendant Union Retail Realty Inc. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

77.     Defendant Rentar Retail Realty Corp. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

78.     Defendant Olney Retail Realty Corp. is a Pennsylvania corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

79.     Defendant Darby Retail Realty Corp. is a Pennsylvania corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

80.     Defendant Elizabeth Retail LLC is a New York limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

81.     Defendant Cheltenham Retail Realty LLC is a Pennsylvania limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

82.     Defendant Greenbriar Retail Realty LLC is a Georgia limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

83.     Defendant Severance Retail Realty LLC is an Ohio limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

84.     Defendant Ford City Retail Realty LLC is an Illinois limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

85.     Defendant Cicero Retail Realty LLC is an Illinois limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

86.     Defendant Hamden Retail Realty LLC is a Connecticut limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

87.     Defendant Conway Stores of South Dekalb LLC is a Georgia limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

88.     Defendant Fayetteville Retail Realty LLC is a Georgia limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

89.     Defendant Morrow Retail Realty LLC is a Georgia limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

90.     Defendant 501 Adams Ave Retail (PA), Inc. is a Pennsylvania corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

91.     Defendant Carteret Distribution Co. Inc. is a New York corporation with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

92.     Defendant Conway Four LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

93.     Defendant Conway Midwest LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

94.     Defendant Conway East LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

95.     Defendant Hairston Retail Realty LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

96.     Defendant Madison Retail Realty LLC is a Delaware limited liability company with its principal place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.

97.     Defendant Morris Cohen is an individual with a place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.  At all times material hereto, Morris Cohen was the Chief Executive Officer of Conway, and a principal of the other Conway Seller entities.

98.     Defendant Abe M. Cohen is an individual with a place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.  At all times material hereto, Abe Cohen was a principal of Conway Stores, Inc. and the other Conway Seller entities.

99.     Defendant Jeffrey Cohen is an individual with a place of business at 39 West 37th Street, 3rd Floor, New York, NY 10018.  At all times material hereto, Jeffrey Cohen was a principal of Conway Stores, Inc. and the other Conway Seller entities.

100.    The Defendants identified in Paragraphs 63 through 99 above are referred to herein, collectively, as the "Conway Sellers."

### 4.     Conway Creditors

101.    Defendant Active USA, Inc. is a corporation with its principal place of business at 1807 E. 48th Place, Los Angeles, CA 90058.

102.    Defendant One Step Up Ltd. is a corporation with its principal place of business at 1412 Broadway, 7th Floor, New York, NY 10018.

103.    Defendant Allura Imports Inc. is a corporation with its principal place of business at Allura Imports Inc., 112 West 34th St Rm 1127, New York, NY 10120.

104.    Defendant Knitwork Productions II, LLC d/b/a American Attitudes is a limited liability company with its principal place of business at 1410 Broadway, 24th Floor, New York, NY 10018.

105.    Defendant Baby Vision Inc. is a corporation with its principal place of business at 30 Firemens Way, Poughkeepsie, NY 12603.

106. Defendant Bamboo Jeans Corp. is a corporation with its principal place of business at 255 W. 36th Street, New York, NY 10018.

107. Defendant Ben Elias Industries Corp. is a corporation with its principal place of business at 1400 Broadway, New York, NY 10018.

108. Defendant Blue Star Clothing is a corporation with its principal place of business at 1370 Broadway 6th Floor, New York, NY 10018.

109. Defendant Bobens Trading Co. Inc. is a corporation with its principal place of business at 1140 Motor Pkwy #B, Hauppauge, NY 11788.

110. Defendant Braha Industries Inc. is a corporation with its principal place of business at 10 West 33rd St., New York, NY 10001.

111. Defendant Briara Trading Co. is a corporation with its principal place of business at 70 Portland Road, West Conshohocken, PA 19428.

112. Defendant CDB Brands Inc. is a corporation with its principal place of business at 1370 Broadway Suite 810, New York, NY 10018.

113. Defendant Cherry Stix Ltd is a corporation with its principal place of business at Cherry Stix Ltd., 1407 Broadway, New York, NY 10018.

114. Defendant Children's Apparel Network Ltd. is a corporation with its principal place of business at 77 South 1st Street, Elizabeth, NJ 07201.

115. Defendant Consensus Advisory Services, LLC is a limited liability company with its principal place of business at 660 Madison Avenue, Suite 1600, New York, NY 10065.

116. Defendant Consensus Securities, LLC is a limited liability company with its principal place of business at 660 Madison Avenue, Suite 1600, New York, NY 10065.

18

117.     Defendant Country Silk Inc. is a corporation with its principal place of business at 100 S. Washington Ave., Dunellen, NJ 08812.

118.     Defendant Creative Realty Group LLC is a limited liability company with its principal place of business at 3610 NE 1st Ave., Miami, FL 33137.

119.     Defendant Cudlie Accessories LLC is a corporation with its principal place of business at 1 E. 33rd Street, New York, NY 10016.

120.     Defendant Danbee, Inc. is a corporation with its principal place of business at 3360 E. Pico Blvd., Los Angeles, CA 90023.

121.     Defendant Noah USA Inc. d/b/a Davida Fashion is a corporation with its principal place of business at 1015 S. Crocker St. #Q20, Los Angeles, CA 90021.

122.     Defendant Dreamwear Inc. is a corporation with its principal place of business at 183 Madison Ave., New York, NY 10016.

123.     Defendant EHL Imports Corp. is a corporation with its principal place of business at 501 East 89th Street, Brooklyn, NY 11236.

124.     Defendant Esti Couture Inc. is a corporation with its principal place of business at 1407 Broadway, Suite 2507, New York, NY 10018.

125.     Defendant Feinberg Realty Associates, L.P. is a partnership with its principal place of business at 1824 Byberry Road, Bensalem, PA 19020.

126.     Defendant Gina Group, LLC is a limited liability company with its principal place of business at 10 West 33rd St., New York, NY 10001.

127.     Defendant Preger & Wertenteli, Inc. d/b/a Gold Medal International is a corporation with its principal place of business at 19 West 34th St., New York, NY 10001.

128.     Defendant Goldstone Hosiery Co. Inc. is a corporation with its principal place of business at 10 West 33rd St. Room 1006, New York, NY 10001.

129.     Defendant Greentown, LLC is a limited liability company with its principal place of business at PO Box 3147, Fort Lee, NJ 07024.

130.     Defendant Haselson International Trading Inc. is a corporation with its principal place of business at 350 Fifth Avenue, Suite 315, New York, NY 10118.

131.     Defendant Have Fashion Inc. is a corporation with its principal place of business at 3360 E. Pico Blvd., Los Angeles, CA 90023.

132.     Defendant iApparel, LLC is a limited liability company with its principal place of business at 1407 Broadway, New York, NY 10018.

133.     Defendant Int'l Intimates Inc. is a corporation with its principal place of business at 31 W. 34th St., New York, NY 10001.

134.     Defendant Isaac Import Inc. is a corporation with its principal place of business at 1407 Broadway, Suite 1416, New York, NY 10018.

135.     Defendant J Creations Intl LLC is a limited liability company with its principal place of business at 1407 Broadway, Suite 1922, New York, NY 10018.

136.     Defendant Jaylyn Sales Inc. is a corporation with its principal place of business at 19 W. 34th St., New York, NY 10018.

137.     Defendant JCS Apparel Group Inc. is a corporation with its principal place of business at 1407 Broadway #202, New York, NY 10018.

138.     Defendant Jesco Footwear Inc. is a corporation with its principal place of business at 37 W. 37th St., Suite 301, New York, NY 10018.

139.     Defendant Julius Young Hosiery Inc. is a corporation with its principal place of business at 38 Blanchard St., Newark, NJ 07105.

140.     Defendant Just One LLC is a limited liability company with its principal place of business at 1450 Broadway, 21st Floor, New York, NY 10018.

141.     Defendant Lany Group, LLC is a limited liability company with its principal place of business at 1385 Broadway, Room 601, New York, NY 10018.

142.     Defendant Lati Fashion International Inc. is a corporation with its principal place of business at 2041 McDonald Ave., Brooklyn, NY 11223.

143.     Defendant Leonard Feinberg Inc. is a corporation with its principal place of business at 1824 Byberry Road, Bensalem, PA 19020.

144.     Defendant Lorency & Co. LLC is a limited liability company with its principal place of business at 1370 Broadway, Suite 804, New York, NY 10018.

145.     Defendant Lollytogs Ltd. d/b/a LT Apparel Group is a corporation with its principal place of business at 321 Herrod Blvd., Dayton, NJ 08810.

146.     Defendant M.T. Packaging, Inc. is a corporation with its principal place of business at 1276 50th Street, Brooklyn, NY 11219.

147.     Defendant MAC Logistics is a corporation with its principal place of business at 3 Garnet Lane, Freehold, NJ 07728.

148.     Defendant Maverick Apparel LLC is a limited liability company with its principal place of business at 1384 Broadway, 16th Floor, New York, NY 10018.

149.     Defendant Native Group Int'l is a corporation with its principal place of business at 385 5th Ave., 3rd Floor, New York, NY 10016.

150.    Defendant New York Accessories Group Inc. is a corporation with its principal place of business at 411 5th Avenue, New York, NY 10016.

151.    Defendant Northpoint Trading, Inc. is a corporation with its principal place of business at 347 5th Avenue, New York, NY 10016.

152.    Defendant Panties Plus Inc. is a corporation with its principal place of business at 320 5th Ave., 2nd Floor, New York, NY 10001.

153.    Defendant Poetry Corporation is a corporation with its principal place of business at 2111 Long Beach Avenue, Los Angeles, CA 90058.

154.    Defendant PG Wear Corp. d/b/a Pretty Good is a corporation with its principal place of business at 1100 San Pedro, Suite A6, Los Angeles, CA 90015.

155.    Defendant Saramax Apparel Group Inc. is a corporation with its principal place of business at 1372 Broadway, 7th Floor, New York, NY 10018.

156.    Defendant Sasha Handbags Inc. is a corporation with its principal place of business at 460 Main Ave., Wallington, NJ 07057.

157.    Defendant Seven Apparel Group is a corporation with its principal place of business at 347 5th Ave., New York, NY 10016.

158.    Defendant Simex Trading Co. is a corporation with its principal place of business at 1407 Broadway, Suite 2507, New York, NY 10018.

159.    Defendant Simon International Trading Corp. is a corporation with its principal place of business at 1633 Sheepshead Bay Road, 2nd Floor, Brooklyn, NY 11235.

160.    Defendant Sterling National Bank is a corporation with its principal place of business at 500 7th Avenue, 3rd Floor, New York, NY 10018.

161.    Defendant The Timing Inc. d/b/a La Vie 89 is a corporation with its principal place of business at 110 S San Pedro St., Suite A-8, Los Angeles, CA 90015.

162.    Defendant Today's Apparel Inc. is a corporation with its principal place of business at 1407 Broadway, Suite 3105, New York, NY 10018.

163.    Defendant Skiva International, Inc. d/b/a Trendset Originals is a corporation with its principal place of business at 1407 Broadway, 5th Floor, New York, NY 10018.

164.    Defendant Tri-Coastal Design Group Inc. is a corporation with its principal place of business at 40 Harry Shupe Blvd., Wharton, NJ 07885.

165.    Defendant Tuff Cookies Inc. is a corporation with its principal place of business at 110 W 34th Street, 7th Floor, New York, NY 10001.

166.    Defendant Unity International Inc. is a corporation with its principal place of business at 1407 Broadway, Suite 2317, New York, NY 10018.

167.    Defendant Wicked Fashions, Inc. is a corporation with its principal place of business at 222 Bridge Plaza South, Fort Lee, NJ 07024.

168.    Defendant KC Exclusive Inc. d/b/a Zenana is a corporation with its principal place of business at 1100 S. San Pedro, Suite M10, Los Angeles, CA 90015.

169.    Defendant Reich Brothers, LLC ("Reich Brothers") is a Delaware corporation with its principal place of business at 267 Central Avenue, White Plains, NY 10606.

170.    Defendant Fame Fashion House, LLC is an entity with a place of business at 1 West 34th Street, 10th Floor, New York, NY 10001, and a subsequent transferee of the transfer to Reich Brothers.

171.     Defendant Mirage Fashions of NY, LLC, is an entity with a place of business at 1410 Broadway, Suite 505, New York, NY 10018, and a subsequent transferee of the transfer to Reich Brothers.

172.     Defendant Mango USA, Inc., is an entity with a place of business at 5620 1st Avenue, Brooklyn, NY 11220, and a subsequent transferee of the transfer to Reich Brothers.

173.     Defendant Omega Apparel, Inc., is an entity with a place of business at 463 Fashion Avenue, Suite 801, New York, NY 10018, and a subsequent transferee of the transfer to Reich Brothers.

174.     Defendant CHD Home Textiles LLC is an entity with a place of business at 255 Fifth Avenue, 5th Floor, New York, NY 10016, and a subsequent transferee of the transfer to Reich Brothers.

175.     The Defendants identified in Paragraphs 101 through 174 above are referred to herein, collectively, as the "Conway Creditors."

       5.       **Factor Defendants**

176.     Defendant Rosenthal & Rosenthal, Inc. is an entity with a place of business at 1370 Broadway, New York, NY 10018.

177.     Defendant Middlegate Factors LLC is an entity with a place of business at 8 West 40th Street, New York, NY 10018.

178.     Defendant Euler Hermes is an entity with a place of business at 600 S. 7th Street, Louisville, KY 40203.

179.     Defendant Coface is an entity with a place of business at 650 College Rd. East, Suite 2005, Princeton, NJ 08540.

180.    Defendant Steven Sutton is an entity with a place of business at 20 West 33rd Street 2nd Floor, New York, NY 10001.

181.    The Defendants identified in Paragraphs 175 through 180 above are referred to herein, collectively, as the "Factor Defendants."

**6.    Other Defendant**

182.    Defendant KeyBank National Association ("KeyBank") is a national banking association organized under the laws of the United States with its principal place of business at 127 Public Square, Cleveland, OH 44114.  Upon information and belief, KeyBank is the successor to First Niagara Commercial Finance, Inc. ("FNCF").  FNCF was previously a subsidiary of First Niagara Bank, which was merged into KeyBank in October 2016.  FNCF was subsequently also merged into KeyBank, in July 2017.

## IV.    FACTS

183.    The Debtors operated retail stores offering clothing for men, women, and children of all ages, as well as lingerie, shoes, toys, household items, and other discount merchandise.  The Debtors' business was started in 1962 by Fallas's father, Joseph Fallas, and the ownership and control of the company was transferred to Fallas in 2002.

184.    Over the years, the Debtors' business was expanded in part through tack-on acquisitions of other retail chains, including acquisitions of: (i) 31 Weiner's stores in the Houston, Texas area in 2002; (ii) 100 Factory 2-U store locations in 2004; (iii) 78 Conway Stores, Inc. locations in 2014 (the "Conway Acquisition"); and (iv) 40 Anna's Linens store locations in 2015. At the time of the Debtors' bankruptcy filings, the Debtors were operating a total of 344 stores, under various store names.

185.    Fallas was President, Secretary, and Chief Executive Officer of J&M Sales and National Stores, and Fallas and his wife Ilanit were the sole directors of those entities.  Fallas controlled all aspects of the Debtors' business.

186.    The Debtors' corporate structure was not a typical parent-subsidiary relationship. While each Debtor was independently owned by the Fallases (as set forth below), the Debtors' finances and operations were intertwined and they essentially functioned as a single enterprise, including when obtaining credit from third-parties.  By way of example: (i) a cash management system existed between the Debtors that operated retail locations; (ii) intercompany accounts were maintained to account for transactions between the Debtors; (iii) all of the Debtors were identified as borrowers under various secured lending facilities; and (iv) the Debtors cross-guaranteed each other's obligations.

187.    Debtor Caribbean Island is owned 100% by the M&I Fallas Family Trust, of which Fallas and his wife Ilanit are co-trustees.  The other Debtors are owned directly or indirectly by Michael and Ilanit Fallas, as follows:

a.    J & M Sales – 50% The Michael Fallas Living Trust dated 1/19/05 / 50% The Ilanit Fallas Living Trust dated 1/19/05;

b.    National Stores – 98% The Michael Fallas Living Trust dated 1/19/05 / 2% The Ilanit Fallas Living Trust dated 1/19/05;

c.    J&M Texas – 50% Michael Fallas / 50% Ilanit Fallas;

d.    FP Stores – 50% The Michael Fallas Living Trust dated 1/19/05 / 50% The Ilanit Fallas Living Trust dated 1/19/05;

e.    Southern Island – 98% Michael Fallas / 2% Ilanit Fallas;

f.    SI Retail – 50% Michael Fallas / 50% Ilanit Fallas;

g.    Pazzo FNB – 50% Michael Fallas / 50% Ilanit Fallas;

h.    Holdings – 50% Michael Fallas / 50% Ilanit Fallas; and

i.    Pazzo Management – 98% Michael Fallas / 2% Ilanit Fallas.

**A.    The Fallas Enterprise**

188.    Michael and Ilanit Fallas controlled, both directly and through family trusts for which they were trustees, a large group of entities including but not limited to the Debtors and the Fallas SPEs (collectively, the "Fallas Enterprise"), which were co-dependent and used to enrich the Fallases at the expense of the Debtors and their creditors.

189.    Prior to the Debtors' failed Chapter 11 reorganization, the Fallas Enterprise consisted of the Debtors' former retail operations reporting combined annual sales in excess of $750 million, various real estate holdings (including many of the Debtors' store locations) valued in excess of $250 million, and ancillary businesses that were dependent on the Debtors for their viability.

190.    In the years preceding the Debtors' bankruptcy filings, the Fallases purchased commercial real estate at which some of the Debtors' retail stores operated.  The properties were purchased through real estate partnerships and special purpose entities (*i.e.*, the Fallas SPEs), and many were financed through third-party lenders.

191.    At all times material hereto, the Fallas SPEs were owned and controlled by Fallas, with the exception of several which were owned by Fallas and his father Joseph M. Fallas together or by Joseph M. Fallas alone.

192.    The Fallas SPEs which owned properties rented by the Debtors are set forth below. In certain instances, as indicated below, debt refinancings required Fallas to form a new Fallas SPE, and transfer the property from the existing Fallas SPE to the newly-created Fallas SPE.

27

| Store # | Fallas SPE | Property Address |
|---------|-----------|------------------|
| Corp | J&M Properties One, LLC | 15001 S. Figueroa St., Gardena, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 100 | J&M Properties One, LLC | 15001 S. Figueroa St., Gardena, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 101-A | 449 S. Broadway, LLC | 449 S. Broadway, Los Angeles, CA |
| 101-B | 445 South Broadway LLC | 445 S. Broadway, Los Angeles, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 102-A | 6717 Pacific Boulevard RE Holdings, LLC | 6719 Pacific Blvd., Huntington Park, CA |
| | (Owned jointly by Michael & Joseph Fallas (Michael's father)) | |
| 102-B | 6725 Pacific Ventures, LLC | 6725 Pacific Blvd., Huntington Park, CA |
| | Fallas Borrower I, LLC (Refinance closed in July 2018) | |
| | (Owned jointly by Michael & Joseph Fallas (Michael's father)) | |
| 104 | 4765 Whittier RE Holdings, LLC | 4774 Whittier Blvd., Los Angeles, CA |
| | (Owned jointly by Michael & Joseph Fallas (Michael's father)) | |
| 106 | M M & J Ventures | 6633 Van Nuys Blvd., Van Nuys, CA |
| | Fallas Borrower II, LLC (Refinance closed in July 2018) | |
| | (Owned jointly by Michael & Joseph Fallas (Michael's father)) | |

| 111 | Force-Fulton Mall, LLC | 1136 Fulton Mall, Fresno, CA |
| 117 | J&M Properties One, LLC | 575 S. Ventura Rd., Oxnard, CA |
| 118 | J&M Properties One, LLC | 9060 Firestone Blvd., Downey, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 123 | J&M Properties One, LLC | 34 E. 2nd St., Calexico, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 124 | J&M Properties One, LLC | 1661 N. Hacienda Blvd., La Puente, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 132 | J&M Properties I, LLC | 1743 E. Palmdale Blvd., Palmdale, CA |
| 157 | J&M Properties I, LLC | 3011 N. Cedar Ave., Fresno, CA |
| | Fallas Borrower III, LLC (Refinance closed in July 2018) | |
| 165 | Date Palm Cathedral City, LLC | 31833 Date Palm Dr., Cathedral City, CA |
| 173 | 6300 Mack Road, LLC | 6300 Mack Rd., Sacramento, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 186 | Pomona Development, LLC | 601 E. Holt Ave., Pomona, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |

| | | |
|---|---|---|
| 192 | MJF Properties LLC | 10241 S. Padre Island Dr., Corpus Christi, TX |
| 207 | J&M Properties I, LLC | 1800 E. Palo Verde St., Yuma, AZ |
| 215 | J&M Properties One, LLC | 10 Uvalde Rd., Houston, TX |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 216 | J&M Properties I, LLC | 8541 A & B W. Belfort St., Houston, TX |
| | Fallas Borrower III, LLC (Refinance closed in July 2018) | |
| 229 | J&M Properties One, LLC | 1201 Farragut, Laredo, TX |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 251 | J&M Properties I, LLC | 901 Dunlap Ave., Mission, TX |
| 266 | J&M Properties I, LLC | 900 E. Elizabeth St., Brownsville, TX |
| 276 | Ephriham Fort Worth LLC | 2551 Ephriham Dr., Fort Worth, TX |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 289 | J&M Properties I, LLC | 6161 Northwest Loop, 410 San Atonio, TX |
| | Fallas Borrower III, LLC (Refinance closed in July 2018) | |
| 295 | Force-501 East 6th Street LLC | 501 E. 6th St., Del Rio, TX |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |

| | | |
|---|---|---|
| 297 | J&M Properties I, LLC | 1700 S. 23rd St., McAllen, TX |
| | Fallas Borrower III, LLC (Refinance closed in July 2018) | |
| 300 | J&M Properties I, LLC | 333 Montano Rd. NW, Albuquerque, NM |
| 330 | J&M Properties One, LLC | 308-340 E. University Ave., Mesa, AZ |
| 334 | Eagle Pass South Bibb LLC | 455 S. Bibb Ave., Eagle Pass, TX |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 387 | J&M Properties I, LLC | 301 E. San Antonio Ave., El Paso, TX |
| 399 | Force-100 S. Zarzamora Street, LLC | 100 S. Zarzamora St., San Antonio, TX |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 400 | 4010 East Highland Avenue LLC | 4010 E. Highland Ave., Highland, CA |
| 402 | 2602 Somersville Road LLC | 2602 Somersville Rd., Antioch, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 403 | 6895 Sierra Center Parkway LLC | 6895 Sierra Center Pkwy., Reno, NV |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 413 | 201 Town Center West LLC | 201 Town Center West, Santa Maria, CA |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 414 | 409 North Litchfield Road LLC | 409 North Litchfield Rd., Goodyear, AZ |

| 417 | 1261 North Azusa Avenue LLC | 1261 N. Azusa Ave., Covina, CA |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 419 | 4613 East Lancaster LLC | 4613 E. Lancaster, Fort Worth, TX |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 428 | 1467 Country Club Drive LLC | 1467 Country Club Drive, Madera, CA |

| 430 | 909 North Avalon Boulevard LLC | 909, 911, 917 & 921 N. Avalon Blvd., Wilmington, CA |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 431 | MacArthur Boulevard LLC | 10715 MacArthur Blvd., Oakland, CA |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 432 | Ramona Boulevard LLC | 14121 Ramona Blvd., Baldwin Park, CA |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 437 | 840 South Alvarado RE Holdings LLC | 840 S. Alvarado Blvd., Los Angeles, CA |

Fallas Borrower IV, LLC (Refinance closed in July 2018)

| 439 | South Torrence Avenue Lansing LLC | 16809  South Torrence Ave., Lansing, IL |
| 500 | MJF Properties LLC | 2352 E. Lohman Ave., Las Cruces, NM |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 630 | 580 North 11th Street LLC | 580 North 11th Street, Hanford, CA |
| 640 | 1240 West Main Street LLC | 1240 W. Main St., Merced, CA |
| 695 | White Lane Bakersfield, LLC | 2300 White Lane, Bakersfield, CA |
| | Fallas Borrower IV, LLC (Refinance closed in July 2018) | |
| 697 | J&M Properties I, LLC | 525 Main Street, Brawley, CA |

193.     As set forth in greater detail herein, Fallas charged the Debtors above-market rental rates for properties owned by Fallas SPEs.

194.     In certain instances where the Debtors occupied a Fallas SPE-owned property, the lenders themselves, rather than the market, established the rental rate charged to and paid by the Debtors.

195.     Before lenders would advance money to fund the acquisitions of the commercial real estate properties, Fallas needed to show the ability to generate sufficient rental income to support the various operating costs, including taxes, insurance, maintenance and capital improvements as well as the ability to service the lender's debt through the payment of principal and interest.

196.    To report income sufficient to satisfy the lenders, Fallas charged the Debtors above-market and/or excessive rents, which inflated the income of the Fallas SPEs at the expense of the Debtors and their creditors.

197.    In at least one instance (and as set forth in greater detail herein), to satisfy a Fallas SPE's lender, the Debtors paid phantom rent to a Fallas SPE for a location at which Debtors did not operate.

198.    The Debtors' payment of above-market and/or excessive rents to Fallas SPEs proved very lucrative for the Fallases.  Fallas SPEs became more valuable as a result of the "income" being generated from the Debtors' payment of rent, while the Debtors were insolvent as early as May 2014.

199.    Fallas SPEs were also able to obtain favorable financing as a result of the inflated rental "income" and were refinanced several times between 2013 and 2018, allowing the Fallases to receive significant cash distributions to their personal benefit at the expense of the Debtors and their creditors.

200.    For example, in May 2017, Fallas refinanced one of his properties and received cash at closing of approximately $9 million, and in July 2018, Fallas refinanced 31 of his properties and received cash at closing of approximately $21 million.  These distributions rightfully belonged to the Debtors and should be returned.

201.    The Fallas Enterprise's reliance on the Debtors' retail operations is demonstrated by the flow of monies circulated through the Fallas Enterprise.  The Debtors would pay rents to Fallas SPEs, thereby providing the Fallases with significant cash flow in the form of distributions and loans.  A portion of these cash flows would then be reinvested back into the Debtors (typically

in the form of subordinated and allegedly secured loans from Fallas) in order to fund the Debtors' losses and sustain the Debtors' otherwise failing business.

202.    For example, in 2014 Fallas loaned Debtor Southern Island $11.7 million in the form of subordinated notes.  The funds for these loans were sourced from various Fallas SPEs, as follows:

| | |
|---|---|
| $7,000,000 | J&M Properties, LP |
| $1,300,000 | 449 S. Broadway, LLC |
| $900,000 | Ramona Boulevard LLC |
| $600,000 | 410 East Highland Avenue LLC |
| $500,000 | Eagles Pass South Bibb LLC |
| $500,000 | 1261 North Azusa Avenue LLC |
| $400,000 | 2602 Somersville Road LLC |
| $200,000 | Force-100 S. Zarzamora Street LLC |
| $150,000 | 201 Town Center West LLC |
| $150,000 | 1467 Country Club Drive LLC |
| $11,700,000 | TOTAL |

This pattern of Fallas loaning money to the Debtors, sourced primarily from Fallas SPEs, continued through 2017, for the purpose of funding the Debtors' significant operating losses.

203.    Upon information and belief, Fallas sustained this setup because without the Debtors' rent payments, the Fallas SPEs and other ancillary Fallas Enterprise businesses would have ceased being profitable and been in danger of collapse.

204.    The Debtors individually and on a combined basis were inadequately capitalized, were insolvent from May 2014 through the Petition Date (as set forth in further detail herein), and

were being sustained by loans from Fallas and the Fallas SPEs, whose funds were primarily sourced from outsized and inflated rents paid by the Debtors.

205.     Fallas exercised complete dominion and control over the Debtors, Fallas SPEs, and other Fallas-controlled entities, and failed to observe corporate formalities between the various entities.  As set forth in further detail herein, Fallas siphoned company funds from the Debtors through dividends and equity distributions and the payment of above-market rents to Fallas SPEs.

206.     Fallas's authoritarian management style, coupled with the absence of any independent board members, created a complete lack of oversight which allowed this course of conduct to continue unchecked for years, at the expense of the Debtors and their creditors.

207.     The Fallas Enterprises were managed from the Debtors' corporate headquarters in Gardena, California, a property which was owned by a Fallas SPE.

208.     Debtors' employees routinely performed services for the benefit of the Fallas SPEs and Fallas personally.  The management, bookkeeping, record retention, billing and invoicing, and payables for the Fallas Enterprise were the responsibility of Debtor employees.  Additionally, the mailing address utilized for all the entities within the Fallas Enterprise was 15001 South Figueroa Street, Gardena, CA 90248, which was the Debtors' mailing address and corporate headquarters.

209.     Examples of Debtor employees working for the benefit of non-Debtor entities within the Fallas Enterprise include the following:

> a.     High-ranking Debtor personnel, including but not limited to Sandy Menichelli (Chief Financial Officer), Randy Swanson (Treasurer), Michael Crosby (Director of Financial Planning), and Claudia Pena (Real Estate Accounting Manager), worked on the sale, purchase, financing, and refinancing of the Fallas SPEs.

36

b.      Prior to the Debtors' bankruptcy filings, the Debtors' employed SierraConstellation Partners, LLC, an operational and financial advisory consulting firm, to assist the Debtors. Curt Kroll, a senior director for SierraConstellation Partners, LLC, subsequently became the Debtors' interim Chief Financial Officer and then Chief Restructuring Officer. Mr. Kroll, at the direction of Fallas, performed various services for the benefit of the Fallas SPEs and Fallas personally, including working on the refinancing of 31 properties owned by Fallas SPEs in July 2018, which yielded cash proceeds for Fallas of approximately $21 million. Upon information and belief, Fallas used $10 million from the proceeds to partially fund Pegasus Trucking LLC's ("Pegasus") purchase of certain of the Debtors' assets during the Chapter 11 proceedings.

c.      Debtor employees maintained the Fallas SPEs and other non-debtor Fallas-controlled entities as part of their regular responsibilities. For example, Claudia Pena (Real Estate Accounting Manager) maintained the financial records of the Fallas SPEs through QuickBooks, including banking functions and the preparation of monthly financials and reporting packages required by the various credit facilities that loaned money to Fallas SPEs. Pena also prepared and filed entity registration documents for the Fallas SPEs.

210.    The collapse of the Debtors' retail operations had immediate negative consequences and adverse ripple effects on the other entities controlled by the Fallases, because those entities were largely dependent on the Debtors.

211. Upon information and belief, the Debtors' bankruptcy filings caused several credit facilities with Fallas SPEs to be in default, due to their reliance on the Debtors' ability to pay rents. Additionally, it appears the Fallases began to market certain of the Fallas SPE-owned properties once the Debtors' reorganization efforts had failed in late 2018.

212. The Fallas Enterprise is the alter ego of the Fallases. As described above, the Fallases used the entities within the Fallas Enterprise to enrich themselves, often to the detriment of others and particularly to the detriment of the Debtors' creditors, which have been left holding the bag for claims in excess of $200 million.

213. Because substantially all of the Debtors' assets were liquidated prior to conversion of the Debtors' bankruptcy cases to Chapter 7 (thereby leaving no residual cash for distribution to administrative and unsecured creditors), the instant litigation provides the only meaningful avenue for a distribution to creditors.

214. Defendants Michael and Ilanit Fallas and the Fallas SPEs should be viewed as a single enterprise, the alter ego of and liable to the Debtors for the goods and services provided to the Debtors and for which Debtors were left holding the bag. As described above, the Debtors' creditors, who have claims in excess of $200 million, enriched Defendants Michael and Ilanit Fallas and the Fallas SPEs as a whole and the Trustee should be allowed to pierce the corporate veil in an effort to recover funds for the benefit of the Debtors and their creditors who have been significantly harmed by the wrongdoing of Defendants Michael and Ilanit Fallas and the Fallas SPEs.

215. At present, the Fallases continue in business, albeit with a smaller footprint, following the purchase by Pegasus (an entity owned and controlled 100% by Fallas) of Debtors' assets during the Chapter 11 bankruptcy proceedings, including 85 former Debtor locations which

38

are now being operated by Pegasus under the "Fallas" brand.  Pegasus also purchased several of the Debtors' leases with Fallas SPEs and, upon information and belief, has continued to pay rents to those Fallas SPEs since late 2018, for the benefit of the Fallases.

### B.    The Conway Acquisition

216.    In May 2014, Fallas caused the Debtors to bail out the failing Conway retail chain, which was on the verge of bankruptcy.

217.    The Debtors acquired 78 Conway store locations and assumed more than $45 million in liabilities owed by Conway to third parties.

218.    While ostensibly intended to expand the Debtors' retail footprint into the East Coast and Midwestern states, Fallas rushed closing on the transaction, conducted little to no due diligence, and ignored information regarding harmful effects the transaction would have on the Debtors, as well as concerns raised by other Debtor personnel.

219.    Not surprisingly, the Conway Acquisition was an operational and financial disaster for the Debtors, triggering the immediate, rapid decline in the Debtors' financial condition, a downward spiral from which the Debtors never recovered.

### 1.    The Debtors Overpay For Distressed Conway Business

220.    On October 31, 2013, Sandra Menichelli, Chief Financial Officer of the then-existing Debtor entities, executed a Confidentiality Agreement with Conway Stores, Inc. to receive diligence information with respect to a potential investment in Conway, which was in dire financial condition and exploring potential restructuring alternatives, including raising capital.

221.    Menichelli advised Fallas in an email dated December 5, 2013 that Conway was moving forward on a deal with another party and was currently engaged in heavy due diligence,

with a deadline to finalize a deal by December 11, 2013.   However, that deal was never consummated.

222.   On December 25, 2013, Fallas sent an email to Menichelli, informing her: "I think I made a deal with Conway.  I told them we could be partners in the perfume business in all the stores.  It will be branded high end. It would be a good idea to have in all stores. The rest is ours."

223.   Fallas recklessly wanted to move as quickly as possible to close on a deal with Conway.  His urgency caused concern for others in the Debtors' organization.  On December 28, 2013, after talking with Fallas, Menichelli emailed Steven Hanan, Chief Operating Officer of the then-existing Debtor entities, to discuss due diligence and information requests to Conway.  Hanan responded:

> I am very concerned with a lot of things about this deal especially past due invoices, once the market hears there has been a sale of the company they will bombard us with calls to get paid, we must come up with a plan, we are in much better position to discuss settlement prior to a purchase of the company.

Menichelli replied:

> I agree.  That's why I am asking Michael [Fallas] for all of the info.  We don't even know what all the entities are that make up the company [Conway], who owns them, what their liabilities are and how they fit together operationally……….I am nervous about moving too quickly but I am trying to balance that with Michael's desire to move forward as quickly as possible.  I don't want them to make their problem our problem.

224.   While later attempting to structure settlement parameters for Conway's creditors, on January 13, 2014, Menichelli emailed Fallas and Hanan the following:

> I like the concept but not sure that the percentages and length of term are right.  We really need to nail down the total payable number and figure out cashflow to know what we can afford.  I'd also like to make the options more equivalent.  We also need to nail down what our limit is for the purchase price.  We are paying $12 million for the senior debt plus $3 million for the tax liability.  How much more makes for a reasonable purchase price? That's what we have to consider.

225.     Conway had engaged Heritage Equity Partners ("HEP"), a financial advisory firm, to evaluate the potential restructuring plan with the Debtors.  HEP concluded that the potential deal between Conway and the Debtors would be a better alternative (*i.e.*, provided a bigger recovery) for Conway's creditors as compared to a Conway bankruptcy filing.

226.     In a letter dated February 1, 2014 to its creditors, Conway admitted that it was insolvent and detailed its bleak financial position.  The letter also offered a settlement of Conway's debts to its creditors, in the form of reduced claims which would be assigned to an entity called CPD 18 Corp., with payment of said claims guaranteed by Debtor National Stores.

227.     The Conway Acquisition was a multi-part transaction, some of which was formally documented and some of which was done on an informal "understanding" basis between the parties.

228.     Phase 1 of the Conway Acquisition commenced with the execution of a Loan Assignment Agreement dated January 22, 2014 (the "Loan Assignment Agreement") between FNCF, newly-formed Debtor entity Pazzo FNB, and Conway Stores, Inc., along with certain of its affiliates.  Pazzo FNB purchased all of FNCF's right, title and interest in FNCF's existing loan to Conway, effectively becoming Conway's lender with a first lien on all of Conway's assets.  The purchase price for the FNCF loan was $11,731,796.48.

229.     Because Pazzo FNB was newly formed solely for purposes of the transaction with FNCF and had no capital, J & M Sales loaned the funds to Pazzo FNB to fund the purchase price. J & M Sales, National Stores, J&M Texas, FP Stores, and The Apparel Group of NY, Inc. obtained a waiver and consent letter dated January 17, 2014 from its secured lender, Israel Discount Bank of New York ("IDB"), to loan up to $12,000,000 to Pazzo FNB to fund the purchase of the FNCF loan to Conway.  J & M Sales wired the purchase price for the FNCF loan directly to FNCF on

January 22, 2014.  J & M Sales was never repaid for its funding of the purchase price for the FNCF loan.

230.    Pazzo FNB assumed this obligation of $11.7 million as part of the Conway Acquisition, and subsequently assigned its rights in the FNCF loan to Southern Island.

231.    Phase 1 of the Conway Acquisition also consisted of inventory liquidation sales at the existing Conway stores.  To effectuate the inventory liquidation sales, on January 24, 2014 Conway entered into an Agency Agreement with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (defined, collectively, as the "Agent" under the Agency Agreement), who acted as Conway's exclusive agent for the limited purposes of selling all of the Merchandise from 87 Conway's retail store locations identified on Exhibit 1 to the Agency Agreement.  The Agent earned certain fees and a sharing of net proceeds, after considering the costs of conducting the liquidation sales.

232.    In connection with Pazzo FNB's purchase of the FNCF loan and the inventory liquidations, Pazzo Management took control of Conway's cash management including deposit control agreements for Conway's bank accounts maintained at First Niagara Bank, N.A.  During the inventory liquidation process all cash disbursements were authorized by the Debtors, through Fallas and Menichelli.  Upon completion of the inventory liquidation process, the Agent and Conway, through the Debtors, entered into a final account reconciliation, in which the parties agreed to the sharing of the liquidation proceeds.  The residual cash left in the Conway bank accounts appears to have been ultimately transferred to the Debtors' accounts.

233.    In exchange for Pazzo FNB's purchase of the $11.7 million FNCF loan, the Debtors received only $4.7 million from the inventory liquidations, which did not amount to reasonably equivalent value.

42

234.    At the completion of Phase 1 of the Conway Acquisition, the Debtors' rebranded the former Conway stores to "Fallas" stores.  Debtor Southern Island was specifically formed to operate the former Conway stores and to effectuate Phase II of the Conway Acquisition.

235.    Phase II of the Conway Acquisition consisted of the purchase of certain of Conway's assets and assumption of most of its liabilities.

236.    Pursuant to the terms of an Asset Purchase Agreement effective as of May 1, 2014 (the "Conway APA"), Southern Island and SI Retail (which, like Southern Island, was specifically formed for purposes of this transaction) acquired certain assets, limited liability company membership interests and leases from Conway Stores, Inc. and certain related entities.

237.    Southern Island and SI Retail are collectively referred to in the Conway APA as the "Buyer."  Fallas executed the Conway APA on behalf of Southern Island and SI Retail.

238.    In the Conway APA, the "Seller" is defined, collectively, as Conway Stores, Inc. and all of the entities listed on Exhibit A to the Conway APA, which lists various affiliates, as well "Morris Cohen, Abe M. Cohen and Jeffrey Cohen with respect to the Assigned Entities."  The "Assigned Entities" are 11 Conway affiliates listed in Schedule 1 to the Conway APA.  Abe Cohen executed the Conway APA on behalf of the Seller entities and, with respect to the Assigned Entities, Abe Cohen, Morris Cohen, and Jeffrey Cohen also executed the Conway APA in their personal capacity.

239.    Schedule 1 of the Conway APA lists the "Purchased Assets," which consisted of: (i) specified leases; (ii) membership or stockholder interest in the Assigned Entities; (iii) specific security deposits; and (iv) all furniture, fixtures, and equipment owned by the Seller and located in the properties under the specified leases.

43

240.    Total consideration paid by Southern Island and SI Retail, in the approximate amount of $46 million, consisted of the assumption of Conway's accounts payable, accrued expenses and the assumption of a note payable from Conway held by another Debtor, Pazzo FNB Corp (details of the loan purchase were described above as part of Phase I).

241.    The Debtors' Audited Combined Financial Statements as of January 31, 2015 overstated the fair value of the assets acquired from Conway as of the acquisition dates, setting forth the following valuations:

| | |
|---|---|
| Cash | $4,733,595 |
| Property and equipment | $572,349 |
| Deposits | $1,044,123 |
| Intangibles | $22,441,000 |
| Goodwill | <u>$17,175,322</u> |
| Total | <u>$45,966,389</u> |

242.    In reality, the true value Southern Island and SI Retail received in connection with the Conway Acquisition was cash, property, equipment, and deposits totaling only $6,350,067.  In exchange, Southern Island and SI Retail assumed liabilities to third-parties which represented a significant portion of Conway's debt, in the amount of $45,966,389.  Further, Southern Island and SI Retail assumed various store operating leases, including future obligations for rent and other lease obligations such as taxes, common area maintenance charges, and insurance.  Schedule 2 of the Conway APA sets forth the "Assumed Liabilities."

243.    Southern Island and SI Retail did not receive reasonably equivalent value for the amounts it paid and/or assumed in connection with the transaction, notwithstanding the expanded store footprint the Debtors purportedly received in the Conway Acquisition.  Conway was a

44

distressed business on the brink of bankruptcy, with stores operating at losses in the years preceding the Conway Acquisition.

244.    The forward-looking projections prepared by the Debtors for the acquired Conway stores were based on underlying assumptions that were unrealistic (which Fallas and the Debtors' representatives knew or should have known at the time the projections were prepared), and thus reflected earning projections which were unreasonable, unattainable and unattained.  Southern Island (the specific Debtor which owned the stores) never achieved a profit, and instead continually incurred losses from its inception until the Petition Date.

245.    Fallas was aware of numerous red flags regarding the ill-advised nature of the Conway Acquisition, but disregarded them and rushed closing on the transaction without obtaining any valuations, fairness opinions, or third-party due diligence and despite concerns raised by other executives of the Debtors.  The red flags disregarded by Fallas included the following:

a.    Conway was insolvent and on the brink of filing for bankruptcy;

b.    Conway incurred operating losses in the years preceding the Conway Acquisition, and many of its stores were not profitable;

c.    On January 14, 2014, counsel for certain Conway Creditors had threatened to commence an involuntary bankruptcy proceeding if debts owed to his clients were not resolved immediately;

d.    The Debtors were inundated with calls from Conway Creditors seeking payments even before the Conway Acquisition closed;

e.    There were distribution challenges and additional cost and efficiency concerns related to expanding into a new geographic footprint on the East Coast, for which the Debtors were unprepared;

f.    Store operating costs, including but not limited to payroll and rental costs, for Conway stores were significantly higher than for the Debtors' stores in other regions; and

g.    Commencing such a large acquisition in a condensed time frame caused significant organizational distraction and disruption, for which the Debtors had insufficient human capital to handle.

246.    Because the Conway Acquisition (i) did not convey reasonably equivalent value to Southern Island and SI Retail and (ii) rendered the Debtors, particularly Southern Island and SI Retail, insolvent as a result, the Conway Acquisition is avoidable as a fraudulent transfer and the Debtors are entitled to recover $45,966,389 from the Sellers and those transferees who benefited therefrom.

247.    The Trustee seeks to avoid all obligations assumed or incurred in connection with the Conway Acquisition and to avoid and recover all transfers made in connection therewith.

**2.    The Debtors' Financial Condition Deteriorates as a Result of the Conway Acquisition**

248.    The Conway Acquisition proved disastrous, crippling the Debtors financially and contributing to their eventual bankruptcy.

249.    The Debtors' financial performance declined materially immediately upon closing of the Conway Acquisition, and continued to decline until the Petition Date.

250.    In the years preceding the Conway Acquisition, the Debtors had been profitable, as set forth below:

| **Fiscal Year End** | **Net Income** | **EBITDA** |
| --- | --- | --- |

| | | |
|---|---|---|
| January 31, 2012[2] | $5,742,158 | $11,370,063 |
| January 31, 2013 | $12,068,141 | $18,101,961 |
| January 31, 2014 | $9,512,543 | $16,409,123 |

251.     Following the Conway Acquisition, however, the Debtors' EBITDA plummeted – from $16.4 million in FY 2013 to $1.6 million in FY 2014 – and the Debtors never again made a profit on a combined basis.  The assumption of Conway's liabilities caused the Debtors – including but not limited to Southern Island and SI Retail – to become insolvent, as a direct result of and upon closing the Conway Acquisition.

252.     In the years following the Conway Acquisition and preceding the Petition Date, the Debtors incurred combined losses as set forth below:

| Fiscal Year End | Net Loss | EBITDA |
|---|---|---|
| January 31, 2015 | ($11,011,795) | $1,599,011 |
| January 30, 2016 | ($26,489,475) | ($9,821,842) |
| January 28, 2017 | ($44,362,011) | ($22,947,670) |
| February 3, 2018 | ($42,919,826) | ($10,185,179) |

253.     The Debtors' books and records demonstrate that they were balance sheet insolvent, with insufficient assets to cover their liabilities, for FY 2015 and every year thereafter through the Petition Date.

254.     Further, as set forth above, the Debtors' records pertaining to FY 2014 overstated the fair value of the Conway assets by nearly $40 million.  Using a fair valuation of the Conway

---

[2]     The Debtors' fiscal year ("FY") ran from February 1 through January 31 of the following calendar year – i.e., FY 2011 ran from February 1, 2011 to January 31, 2012, and so forth.

assets, and taking into account the massive liabilities incurred in connection with the Conway Acquisition, the Debtors were insolvent upon closing on the Conway Acquisition.

255.     The Debtors also had a negative implied equity value during this period.   In particular, as of January 31, 2015, comparable discount retailers had a median enterprise value to EBITDA multiple of 11.8x.   Applying the 11.8x enterprise-value-to-EBITDA multiple to the Debtors' $1.6 million EBITDA for FY 2014 results in the following negative implied equity value, as shown in the below table ($ in 000's):

| | | | | |
|---|---|---|---|---|
| FY 2014 EBITDA | $ | 1,599.0 | $ | 1,599.0 |
| EBITDA multiple | | 11.8x | | 11.8x |
| **Implied Enterprise Value** | **$** | **18,843.5** | **$** | **18,843.5** |
| | | | | |
| **Debt** | | | | |
| Line of Credit | $ | 48,000.0 | $ | 48,000.0 |
| Subordinated Notes Payable, Fallas | $ | 17,450.0 | | -- |
| Other Liabilities | $ | 11,886.6 | $ | 11,886.6 |
| **Total Long Term Debt** | **$** | **77,336.6** | **$** | **59,886.6** |
| | | | | |
| **Implied Equity** | **$** | **(58,493.1)** | **$** | **(41,043.1)** |

As shown in the second column above, even when excluding the $17.5 million in subordinated notes payable to Fallas as of January 31, 2015, the implied equity value is still negative.

256.     Southern Island and SI Retail, in particular, incurred losses since their inception, as set forth below:

| Fiscal Year End | Net Loss |
|---|---|
| January 31, 2015 | ($29,066,001) |
| January 30, 2016 | ($31,674,206) |

48

| | |
|---|---|
| January 28, 2017 | ($23,408,661) |
| February 3, 2018 | ($17,641,343) |

257.     Further, Southern Island and SI Retail reported liabilities exceeding the fair value of their assets for every year since their inception until the Petition Date, as set forth below:

| Fiscal Year End | Assets | Liabilities | Deficiency |
|---|---|---|---|
| January 31, 2015 | $70M | $99M | ($29M) |
| January 30, 2016 | $62M | $123M | ($61M) |
| January 28, 2017 | $55M | $139M | ($84M) |
| February 3, 2018 | $56M | $158M | ($102M) |

258.     Southern Island and SI Retail were insolvent from their inception and never had the ability to pay their obligations as they became due, including but not limited to obligations to Conway Creditors assumed in connection with the Conway Acquisition.

259.     Evaluation of the Debtors' solvency is best viewed on a combined basis because of the manner in which the Debtors intertwined their business.  The Debtors did not prepare financial projections on an entity-by-entity basis but rather on a combined basis.  Reporting to third-parties, including the Debtors' annual audits, was also on a combined basis.  All of the Debtors were identified as 'borrowers' on their bank credit facilities.  Further, it appears that operating costs often were incurred and paid by J & M Sales and allocated to the other Debtors.  Upon information and belief, this was done for tax purposes, as the Debtors were pass-through entities, with the income and losses for each Debtor entity ultimately included on Fallas's personal tax returns.

260.     In communications with third parties, the Debtors' representatives admitted that the Debtors had been profitable before the Conway Acquisition, but not after the transaction.

261.   On January 16, 2017, Menichelli sent an email to Jonathan David Hakakha (of Quantum Capital Partners, a mortgage loan broker) regarding due diligence for refinancing of Fallas's real estate portfolio, which stated in part: "I am working on the financial statements but that may take another day or two to assemble.  But you can assume that this was a highly profitable company until the 2014 [Conway] acquisition and that there have been substantial losses since."

262.   In an internal email dated April 4, 2016, Mark Gunn (the Debtors' Executive Vice President of Organizational Development & Human Resources) delivered the following message to various department heads:

> As part of our culture (being lean and mean) and due to the fact that our sales have been much softer than expected, the Finance department (Michael Crosby and Elvira Moran) will be circulating to each of [you] a copy of your departmental budgets.
>
> We are asking every[one] to comb through your budget and we are looking for a 5% reduction in expenses for the rest of the year. We want you to be prudent yet we need to understand it is not business as usual.  We need to tighten our belts and make smart decisions so that we are running the business responsibly.

263.   The financial and operational problems caused by the Conway Acquisition were a major factor in the Debtors' decision to file for bankruptcy.

264.   Indeed, in August 2018, just days before the Debtors' bankruptcy filing, the Debtors prepared a PowerPoint presentation for a vendor meeting, which contained a slide entitled "How Did We Get Here?" that set forth a timeline of events that had caused Debtors' operational and financial breakdown – with the first event being: **"National Stores overpays for Conway Stores for ~$70 million including working capital needs, and in order to support the vendor base assumes financial debt and trade debt."**  The presentation further contains a slide explaining how "The Top Line Benefit [of the Conway Acquisition] Did Not Outweigh Conway's Costs" (due to, *inter alia*, the burden of "increased store expenses"), and describes "significant cash burn

after the Conway acquisition" which led to increased bank debt, increased trade debt, and the need for cash injections from Fallas to stay afloat.

265.    Similarly, in his Declaration in support of the Debtors' Chapter 11 Petitions and First Day Motions, Chief Restructuring Officer Curt Kroll described the Conway Acquisition as the "most critical[]" of the factors leading to the Debtors' bankruptcy, and explained:

> …Debtors' acquisition of the 78 Conway's stores was a major investment of time and resources.  Conway's stores are overwhelmingly located on the East Coast, which significantly increased operating costs, distribution costs, labor costs and lease rates. Debtors opened a distribution center for the East Coast in 2014 to 2015, which rather than increasing efficiency, significantly impaired it.  Moreover, by assuming substantially all of Conway's legacy debt (both secured debt, vendor payables, unsecured debt and leases), Debtors' EBITDA and profit margin were immediately and negatively impacted.
>
> Additionally, the Conway acquisition negatively affected Debtors' operations and revenues, causing increased freight costs and numerous issues with incorrect deliveries resulting in Debtors having to significantly lower the prices of goods delivered to the wrong stores.  Moreover, Debtor suffered significant operational inefficiencies when it moved operations from Otay[] Mesa to Perris, California in 2016 to accommodate the acquisition.
>
> Debtors' acquisition of Conway severely and negatively impacted the entirety of Debtors' otherwise profitable operations. . .

266.    In rushing to close the Conway Acquisition without conducting proper due diligence and without regard for concerns raised by other executives, Fallas either disregarded or did not bother to determine what the financial and operational impact of the Conway Acquisition would be on the Debtors – including, *inter alia*, disregarding or failing to determine (i) the impact to the Debtors of increased operating, distribution, labor, leasing, and freight costs caused by expanding to the East Coast; (ii) whether the Debtors had distribution capabilities, personnel, and other operational capabilities sufficient to support the already-struggling Conway business; or (iii) the impact to the Debtors of assuming so much of Conway's debt.  Fallas knew or should have known information sufficient to evaluate these factors prior to the closing, but nonetheless

disregarded or failed to consider them, and in doing so prioritized bailing out the failing Conway business over the interests of the Debtors.

### 3. The Debtors Pay Millions of Dollars to Conway Creditors

267. In the months following the Conway Acquisition through the Petition Date, Conway Creditors were routinely inundating the Debtors and Fallas with calls and emails demanding payment for past due obligations and pleading for any responsive communication from the Debtors or Fallas regarding account status. During this period, Conway Creditors also routinely alleged breach of contract, threatened litigation, and placed the Debtors on credit hold for inventory purchases.

268. The assumption of Conway Creditors' obligations also impacted the Debtors' relationships with and ability to pay other creditors. For example, an email dated August 20, 2014 from Steve Korol of Leon Korol Co. to Fred Fox (the Debtors' Executive Vice President, Non-apparel) with the subject line "continuing problems and complete lack of communication with National Stores" details concerns with the Debtors' accounts payable and purchasing departments, concluding: "I used to be afraid if my company did not receive an order from National Stores at a tradeshow. Now, I am afraid if we do."

269. In a chain of emails dated from August 18, 2014 to September 2, 2014, Fox, Randy Swanson (the Debtors' controller), and others discussed payment issues which led Liberty (one of the Debtors' key consumables vendors) to place the Debtors on credit hold. These issues had led Edmond Guindi of Liberty to conclude: "I am very uncomfortable with giving National any more credit. They have officially become my slowest paying customer as of last week. The back and forth is uneasy for me."

270.     These emails are not isolated incidents from disgruntled creditors but were the ordinary course of business of the Debtors' business from the Conway Acquisition through the Petition Date.  The Debtors were routinely receiving communications from vendors pleading for payment and placing the Debtors on credit hold.

271.     As of February 2018, certain Conway Creditors were still demanding payment from the Debtors for debts that were, by that point, at least four years old.  An email dated January 27, 2018, from Aaron Abadi, CEO of National Environmental Group, to Fallas stated:

> My friend, at the end of the day, the Conway guys committed a fraud against vendors that included my company.  Your company was certainly a big part of that. In the process I was robbed of over $200,000.  I like you.  I don't want to hurt you. But I've been trying to make it clear to you that I am not walking away from this. Maybe it's my Syrian blood.  There's nothing wrong with you calling the police when you catch someone shoplifting.  So, you might want to stop ignoring me and see if we can figure something out.

272.     In the years following the Conway Acquisition, the Debtors, as specifically identified on EXHIBIT A hereto, made monetary transfers in excess of $13 million to pay obligations to or for the benefit of Conway Creditors and Factor Defendants which had been assumed by Southern Island and SI Retail as part of the Conway Acquisition.  Most of these monetary transfers were made by Southern Island.

273.     In connection with the Conway Acquisition, HEP, Conway's financial advisory firm, had also acted as the noticing agent for the Debtors, charged with issuing settlement offers to Conway Creditors starting in February 2014, which included seeking discounts and payment plans to resolve the Conway debt which the Debtors would be assuming.

274.     The underlying Settlement Agreements provided to Conway Creditors were between the Conway Creditor, defined as the "Claimant," and both Conway Stores, Inc. and Metro Buying Group LLC, defined therein as "Conway."  There were then accompanying Assignments,

53

which were between the Claimant, Debtor National Stores, and CPD 18 Corp., in which CPD 18

Corp. agreed to assume and be obligated to pay Claimant the amount provided for in the Settlement

Agreement and National Stores agreed to guarantee the payment. National Store's guarantee was

subordinated in all respects to its secured lenders and trade debt. Although Southern Island and

SI Retail were the entities which assumed the Conway Creditor liabilities under the Conway APA,

those entities were inexplicably not parties to the Assignments.

275.     The HEP engagement was very limited in scope, but two years later HEP was still

being inundated with calls from Conway Creditors demanding payments. On May 2, 2016, Ken

Mann, Senior Managing Director at HEP sent the following email to Menichelli and Crosby:

> Mike and Sandy, We continue to take multiple calls per day on this matter, which
> is unacceptable. We were paid for what was supposed to be "2 weeks' worth of
> work, with about 300 creditors" more than 2 years ago. Our engagement letter says
> that if we continue to have to work on this after 30 days, we would be paid another
> lump sum and bill by the hour. Of course, Conway had over 1,000 creditors, and
> the initial phase went on FAR too long, and in the last few months, we've taken
> calls every day. If they go to voicemail, I forward them to Mike. But most times
> we answer the call and are stuck on the phone with somebody looking for answers
> we don't have. I try to pass them to Mike, but they tell me he never returns any
> calls. I never asked for the additional lump sum, which would obviously be due,
> or any hourly fees, but I will begin to bill you for every call from this point on. I
> am sorry that you have either come upon difficult times or simply not willing to
> live up to the agreements you had me make on your behalf, but this cannot be my
> problem anymore. I ask that you send a letter to the many people you are not
> paying, and instruct them not to call us anymore, as I'm certain it is cheaper for you
> to take the calls internally than to have me take them. Thank you.

276.     An internal email dated October 2, 2015 from Michael Crosby (National Stores'

Director of Financial Planning & Analysis) to Fallas and David Terzi included an attachment

detailing settlements of vendor balances for Conway Creditors as of October 1, 2015. The

attachment reflects that $55,068,947 of Conway Creditor claims had been settled for $33,661,050,

of which $16,271,796 had been paid by the Debtors as of August 31, 2015, leaving a remaining

outstanding balance of $17,389,254.

277.    Upon information and belief, the Debtors made an effort in early 2016 to further reduce and re-settle the remaining outstanding balances for Conway Creditor claims, which had been previously settled at a discount in early 2014.  In response to this effort, several Conway Creditors complained to the Debtors, as outlined in an internal email from Terzi to Fallas on March 17, 2016.  Other Conway Creditors agreed to a further reduction, while others responded that the request for a further reduction was unfair and/or criminal.   Still others commenced legal proceedings, such as EHL Imports Corp., which filed a complaint against National Stores on May 19, 2016 in the United States District Court for the Southern District of New York, alleging breach of contract for failure to make payments under the previous settlement agreement entered into in connection with the Conway Acquisition.

278.    In total, the Debtors paid $13,463,332.34 in connection with Conway Creditor claims, following the Conway Acquisition.

279.    The liabilities owed to Conway Creditors related to services and merchandise which had been received by Conway pre-acquisition, not by the Debtors.  As set forth above, the Conway Acquisition itself was an effort to bail out Conway by assuming the bulk of liabilities owed to Conway Creditors, for which the Debtors did not receive reasonably equivalent value and which caused the Debtors – in particular, Southern Island and SI Retail – to become insolvent and remain so until the Petition Date.  Indeed, HEP was engaged to set up settlement arrangements between Conway Creditors and the Debtors before the Conway Acquisition was even consummated. Because the Conway Acquisition is a fraudulent transfer which the Trustee is entitled to avoid, the Debtors' payment of Conway Creditor liabilities assumed as part of the Conway Acquisition – which were made at a time when the Debtors were insolvent and for which the Debtors received no benefit – are likewise avoidable as fraudulent transfers.

### C.     Fallas Enriches Himself and the Fallas Enterprise By Charging the Debtors Inflated Rents

280.    Fallas enriched himself and the Fallas SPEs at the expense of the Debtors and their creditors by charging inflated rents – which were well in excess of market value – for the Debtors' rental of their corporate facility and many of their store locations (and, in one instance, for a location at which the Debtors did not even operate a store), which were owned by Fallas SPEs.  In many instances, these inflated rents were intended to support financing arrangements between Fallas SPEs and their lenders – by, among other things, creating the illusion of higher "profits" and cash flow streams for the Fallas SPEs – all at the expense of and without regard for the Debtors and their creditors.

### 1.     Over-Market and Excessive Rents Paid For Fallas-Owned Properties

281.    The Debtors leased their corporate facility and, as of the Petition Date, 47 of their store locations from Fallas SPEs, which were controlled by Fallas and in which Fallas owned either all or the majority of the ownership interests (with any other ownership interests being owned by members of Fallas's family).  Properties the Debtors leased from Fallas-owned entities are referred to herein, collectively, as the "Fallas-Owned Properties."

282.    The Trustee is seeking to avoid and recover approximately $67 million in rent payments, the detail of which is contained on EXHIBIT B hereto.

283.    The Debtors paid inflated, above-market rents on the Fallas-Owned Properties, which were, on average, significantly higher both per square foot and as a percentage of sales than rents the Debtors paid on properties which were not owned by or affiliated with Fallas.

284.    In FY 2015 and FY 2016, the Debtors paid rent on account of Fallas-Owned Properties totaling approximately $15.8 million and $15 million, respectively.

56

285.    The following table sets forth calculations concerning total store rents and average rent per store for Fallas-Owned Properties compared to the Debtors' other store locations, for FY 2015 and FY 2016, based on information obtained from the Debtors' audited financial statements:

|  | FY2014 | FY2015 | FY2016 |
|---|---|---|---|
| Total Company Sales | $808,039,346 | $805,579,105 | $774,260,592 |
| # of Stores | 304 | 361 | 353 |
| Total Store Rent | $82,276,697 | $91,703,034 | $97,316,571 |
| | | | |
| **Fallas-Owned Properties** | | | |
| # of Stores | 41 | 47 | 47 |
| Total Store Rent | $7,383,047 | $15,809,901 | $14,996,525 |
| Avg Rent per Store | $180,074 | $336,381 | $319,075 |
| | | | |
| **Properties Owned by 3rd Parties** | | | |
| # of Stores | 263 | 314 | 306 |
| Total Store Rent | $74,893,650 | $75,893,133 | $82,320,046 |
| Avg Rent per Store | $284,767 | $241,698 | $269,020 |

286.    As shown in the above figures, in fiscal year 2015 the total amount of rent paid on account of Fallas-Owned Properties *doubled* in comparison to the prior fiscal year, even though the number of Fallas-Owned Properties leased increased only marginally during that time period (from 41 stores in 2014 to 47 stores in 2015).  Further, in FY 2015 the average rent per store for Fallas-Owned Properties increased by almost 87% and was 40% higher than the rest of the store portfolio.  These drastic rent increases did not correlate with or reflect market conditions and were instead improperly inflated to enrich Fallas at the expense of the Debtors.

287.    Payment of these inflated rent prices continued through FY 2017 and FY 2018 until the Petition Date.  To illustrate, the following table sets forth rent metrics for sixteen (16) Fallas-Owned Stores for FY 2016, FY 2017, and the twelve-month period preceding May 2018, and compares statistics regarding those rents with statistics regarding the Debtors' entire store portfolio:

| Selected Fallas-Owned Properties | Rent per Sqft. | | | Rent % of Sales | | |
|---|---|---|---|---|---|---|
| Store # & Location | FY2016 | FY2017 | LTM May-2018 | FY2016 | FY2017 | LTM May-2018 |
| 439 – Lansing, IL | $16.09 | $29.38 | $25.57 | 36.5% | 89.2% | 67.0% |
| 403 – Reno, NV | $14.93 | $15.95 | $15.97 | 26.0% | 27.9% | 27.3% |
| 101 – Los Angeles, CA | $19.71 | $20.56 | $20.13 | 23.6% | 27.3% | 26.8% |
| 399 – San Antonio, TX | $24.94 | $25.37 | $25.39 | 20.9% | 23.7% | 24.5% |
| 400 – Highland, CA | $15.97 | $14.69 | $14.73 | 23.3% | 22.9% | 22.5% |
| 437 – Los Angeles, CA | $32.25 | $33.02 | $33.06 | 20.6% | 21.5% | 22.2% |
| 431 – Oakland, CA | $14.05 | $14.21 | $14.22 | 17.4% | 18.9% | 19.9% |
| 289 – San Antonio, TX | $17.10 | $15.33 | $14.62 | 22.4% | 20.5% | 19.4% |
| 432 – Baldwin Park, CA | $20.07 | $20.38 | $19.53 | 15.5% | 18.8% | 18.1% |
| 207 – Yuma-Palo Verde, AZ | $5.17 | $5.88 | $5.50 | 16.5% | 18.1% | 16.6% |
| 102 – Huntington Park, CA | $14.45 | $14.44 | $14.06 | 9.6% | 10.3% | 10.3% |
| 118 – Downey, CA | $13.93 | $14.40 | $14.41 | 10.6% | 11.8% | 11.7% |
| 300 – Albuquerque, NM | $18.59 | $19.22 | $19.00 | 14.7% | 17.7% | 17.7% |
| 192 – Corpus Christi, TX | $7.88 | $7.78 | $7.67 | 17.3% | 16.4% | 15.6% |
| 417 – Covina, CA | $10.72 | $10.42 | $10.47 | 20.4% | 22.3% | 22.9% |
| 428 – Madera, CA | $7.06 | $7.15 | $6.95 | 15.0% | 17.8% | 17.4% |
| Selected Fallas-Owned Properties (16) Average | $15.81 | $16.76 | $16.33 | 19.4% | 24.1% | 22.5% |
| vs. | | | | | | |
| All Stores (342) Average | $11.90 | $11.99 | $11.84 | 12.1% | 12.7% | 12.2% |

288.    The above table illustrates that rents paid on account of Fallas-Owned Properties were on average typically substantially higher per square foot and as a percentage of sales in comparison with the Debtors' entire store portfolio.  Store #439 in Lansing, Illinois, in particular, represents a particularly glaring example of drastically higher than average rent being paid (particularly with respect to rent paid as a percentage of sales) on a Fallas-Owned Property.

289.    Due to the Debtors' payment of inflated and above-market rents, the Debtors' overall rent expenses were substantially higher than those of comparable retail chains, such as Burlington Stores, Inc., Ross Stores, Inc., The TJX Companies, Inc., Dollar General Corporation, Dollar Tree, Inc., and Five Below, Inc.

290.    Comparing the last-twelve-month figures for net rent expenses of these six comparable retail chains to those of the Debtors reveals that the comparable companies' rent as a percentage of sales averaged 4.6% for historical years (ending November 2018), while the Debtors' (for the period ending May 2018) was approximately 12% – two to three-and-a-half times higher than each of the companies used for comparison.

291.    Upon information and belief, in many cases rents on Fallas-Owned Properties were artificially inflated to satisfy lenders, with which Fallas had taken out large loans on the properties. In these instances, Fallas would have the Debtors pay rental rates on Fallas-Owned Properties that were well in excess of market rates – *five times more* in the example set forth below – to inflate the cash flow stream for the Fallas SPE that owned the property.

292.    For example, on December 4, 2013, Menichelli exchanged emails with representatives of RBS Citizens, N.A. ("RBS Citizens"), an affiliate of Citizens Financial Group, Inc., regarding the financing of nine store locations.  After Menichelli sent profit and loss statements to RBS Citizens, Matt Woodman, Vice President – Credit asked:

59

Quick question on the P&L's.  The P&L for Store #101 is reflecting an operating loss and net loss at 1/28/12 and YTD 11/2/13 and essentially operated breakeven for the fiscal period ending 2/2/13.

It appears the operating performance is being significantly affected by the Rent/CAM Charges.  Is this correct?

I know we discussed this topic during our call today, but would you please explain why the rents are so high.

Menichelli responded the same day:

It is the rent on that store that makes it appear unprofitable.  Store 101 is in a 10 floor building in downtown LA.  About 6 years ago, we took out a loan on the building of about $16 million to finance the conversion of floors 3 through 10 into residential loft apartments. [. . .] The loan was not a construction loan that converted to a perm – it was a permanent loan where the proceeds were used for construction. **The lender then needed a cash flow stream to support the debt service.  That cash flow came in the form of rent from the store.  The rent then increased very significantly to satisfy the lender.  It is not the level of rent we would ordinarily pay but it makes sense for Michael in the big picture.  Prior to the loan, the rent on that store was roughly 1/5 of the current rate.**  If you were to use the old rental rate, the store is quite profitable.  Hope that explains it.

(emphasis added).

293.    In another email chain dated March 4, 2014, Pena and Menichelli discussed rental

rates for five of the Debtors' stores at Fallas-Owned Properties.  Pena asked Menichelli:

Ms Sandy – the rent checks for the following owned stores were not retunrd [sic] to AP and we're trying to trace where they might be –

> S400 – Highland
> S402 – Antioch
> S403 – Reno
> S413 – Sta Maria
> S417 – Covina

I'm just wondering of Michael [Fallas] turned them over to you for review. Please advise.

Menichelli replied later that same day:

They are on my desk.  Michael asked some questions about them and I haven't had a chance to talk to you about them.  Michael thought the rent seemed high.  (I told

him it was because the landlord is a son of a gun.) He wanted to know what the loan amount was on the property, who the lender is, what the monthly payment is, amortization term and interest rate. Will you please put a quick schedule together for these properties? Thanks.

Pena replied:

So funny but so true, see attached schedule…………
I agree that the rents set by IDB are quite high but it is what it is………
Except for Santa Maria, these stores also pay for estimated cam and taxes on a monthly basis.

294.    Thus, rents were being established not by the market, but by Fallas SPE lenders at levels necessary to support various loan facilities.  Apparently, Fallas himself thought the rents were high – an assessment with which Menichelli and Pena agreed – but nonetheless had the Debtors keep paying the artificially high rental rates in order to benefit Fallas SPEs.

295.    Certain of the Fallas-Owned Properties included not only space rented by the Debtors, but also additional space that was rented by third parties not affiliated with Fallas – often at a substantially lower price per square foot than what the Debtors were paying, despite being at the same location.  For example:

a.    Store 102-B (Huntington Park, CA), Owned by 6725 Pacific Ventures, LLC: Debtor National Stores paid monthly rent of $9,000 to lease 4,275 square feet ($25.26 annual base rent per square foot).  At the same property location, Payless Shoes also leased 4,275 square feet, but for only $4,000 per month ($11.23 annual base rent per square foot).  Thus, National Stores paid 125% more than Payless Shoes for the same amount of space at the same location.

b.    Store 403 (Reno, NV), Owned by 6895 Sierra Center Parkway LLC (assigned to Fallas Borrower IV, LLC in July 2018): Debtor FP Stores paid

monthly rent of $34,116 to lease 28,416 square feet ($14.41 annual base rent per square foot).  At the same property location, a company called Need 2 Speed leased 50,400 square feet, but only paid monthly rent of $25,200 ($6.00 annual base rent per square foot).  Thus, FP Stores paid 140% more per square foot than Need 2 Speed for leased space at the same location.

    c.    Store 289 (San Antonio, TX), Owned by J&M Properties I, LLC (assigned to Fallas Borrower III, LLC in July 2018): Debtor J&M Texas paid monthly rent of $33,333 to lease 30,680 square feet ($13.04 annual base rent per square foot).  At the same property location, Texas Western Warehouse leased 28,570 square feet, but only paid monthly rent of $14,285 ($6.00 annual base rent per square foot).  Thus, J&M Texas paid 117% more per square foot than Texas Western Warehouse for leased space at the same location.

296.    Additionally, at times Fallas-Owned Properties would have vacant and available space, in addition to the Debtors' store space.  In such instances, it appears from the Debtors' records that the Debtors would pay the additional common area maintenance charges ("CAM") and property taxes associated with the non-leased available space, in order to benefit Fallas and provide "cash flow" to cover Fallas SPE expenses for the non-leased available space.  Examples include:

    a.    Store 400 (Highland, CA), Owned by 4010 East Highland Avenue LLC – Debtors leased 31,716 square feet; 46,750 square feet were vacant.

    b.    Store 295 (Del Rio, TX), Owned by Force-501 East 6th Street LLC (assigned to Fallas Borrower IV, LLC in July 2018) – Debtors leased 22,880 square

feet; third party Parson's Wheeler leased 6,500 square feet; 12,140 square feet were vacant.

     c.     Store 192 (Corpus Christi, TX), Owned by MJF Properties LLC – Debtors leased 28,620 square feet; third party Flex Fit Gym leased 12,289 square feet; 13,731 square feet were vacant.

In each of these instances, the Debtors paid CAM and property tax expenses related to the vacant space, in addition to expenses and inflated rent on its own leased space.

### 2. Rent Payments Made for Nonexistent "Store #414" in Goodyear, Arizona

297.     The Debtors also made rent payments on account of at least one store that never existed.

298.     Beginning in 2013, the Debtors' rent rolls reported annual rent of $271,800 being paid for "Store #414" located at 409 N. Litchfield Rd. in Goodyear, Arizona (the "Goodyear Property"), a property owned by a Fallas SPE named 409 North Litchfield Road LLC. However, the Debtors never actually opened or operated a store at this location.

299.     The Trustee is seeking to avoid and recover $1,076,838.58 on account of phantom rent paid for Store #414, the detail of which is contained on EXHIBIT B hereto.

300.     Fallas had purchased the Goodyear Property in August 2013. Later that year, Fallas undertook a process to refinance certain of his properties (including the Goodyear Property) through RBS Citizens. During that process, third-party appraisals were performed by CBRE.

301.     When Fallas purchased the Goodyear Property, it consisted of two site pads. One site pad was leased to Big Lots, which operated an existing store there. The other site pad was vacant and Fallas planned to open a Debtor store location there. However, the lease with Big Lots

apparently had a clause which did not permit the existence of a new "discount store," which precluded Fallas from opening a Debtor store on the vacant site pad.

302. On December 11, 2013, Claudia Peña, the Debtors' Real Estate Accounting Manager, emailed Menichelli regarding an information request from CBRE for an appraisal of the Goodyear Property. Peña asked Menichelli, "although we're already charging the store for rent, we are not able to open in Goodyear due to issues with Biglots [sic]. How would you like to present this situation in the rent roll and P&L?" Menichelli replied, "[t]he rent roll should show the rent of both tenant – Big Lots and FP Stores. We can just say the truth – that we expect our store to open sometime in Q1 2014."

303. Despite not operating a store at the Goodyear Property, the Debtors paid rent to the benefit of Fallas personally. Regardless of whether valid leases existed, the debt that Fallas borrowed against the Goodyear Property needed to be repaid. In order to service the debt, Fallas directed the Debtors to pay rents (the specific amounts of which were established by the lender, RBS Citizens), to the Fallas-controlled entity that owned the Goodyear Property, knowing that the Debtors were receiving no value in exchange for the payment of rents. Fallas, Menichelli, and other Debtor employees, as well as RBS Citizens, were aware of the nature and purpose of this arrangement.

304. In a December 30, 2013 email exchange between Peña, Menichelli, Patrick Senske of RBS Citizens, and counsel for RBS Citizens, Peña advised RBS Citizens that "We don't have an affiliate entity lease for Goodyear yet; let me know the proposed rents & expiration and we'll make one using the master lease." Counsel for RBS Citizens replied, "Monthly Rent: $22,587.76[;] Expiration Date: 12/31/2018."

305.    The Debtors never opened a store at the Goodyear Property, due to the restriction

on use – which Fallas knew about before purchasing the Goodyear Property.

306.    Alejandra Godoy, the Debtors' Real Estate Manager discussed the restrictions

relating to the Big Lots lease in an email dated April 13, 2015 to Menichelli:

> The first attachment is a copy of the Big Lot's lease.  The second attachment
> includes the Permitted Use clause which also shows the restrictions.  The second
> paragraph of 4(a) contains certain uses which are not allowed, including a "discount
> store".  Before we purchased the building, Rob and Rich Rizika approached the
> previous owner to get that restriction removed and at that time Big Lots asked for
> rent concession that amounted to about $1M in the next 24 years.  After we
> purchased the building, Rich approached Big Lots again and more recently Neil
> also contacted Big Lots through a former colleague, but Big Lots again denied the
> request.  We can discuss at your convenience.

Menichelli replied the same day:

> Okay – doesn't look good for the home team.  But what's interesting is that the
> "discount stores" that are named and explicitly prohibited are all retailers who are
> heavy into hard goods and not apparel.  So it's not clear why they are objecting to
> us given we are so heavy in apparel.

307.    On March 4, 2015, Peña emailed Menichelli the following:

> Alejandra [Godoy] met with Michael [Fallas] this morning regarding the vacancies
> that we still have for some of the owned properties.  In the process, Michael told
> Alejandra that he wants to reduce the rent for our store 400 (Highland) and stop
> paying rent for store 414 (Goodyear).
>
> I understand that the rent that our store is paying for Highland is quite expensive
> $12 psf + NNNs and Michael wants $8 + NNNs and for Goodyear Michael wants
> to stop charging since we were not able to open due to the conflict with Biglots.
>
> I think Michael should be reminded that the Leases for both stores were required
> by the banks; IDB for Highland & RBS for Goodyear when we did the financing
> so I don't think we can just reduce or stop charging rents.
>
> We can probably go back to IDB once we get a sub-tenant for Highland; we're
> currently working on a deal with 99 Cents but it's still in the early stages.

Menichelli replied: "I agree – we can't change the rents without the lender's consent.  I'll remind

Michael. Thanks."

308.     In an email dated May 5, 2016 from Peña to Arielle Whitehouse of Lockton Insurance Brokers, LLC discussing insurance premiums for various Fallas properties, Peña wrote:

> Can I at least have the premiums for the owned locations below for now? I've provided the annual sales for 2015.  We have big tenants on these properties and I need to provide them with the reconciliations this month, there's a deadline per their leases –
>
> […]
>
> $0.00          Fallas 414            409 N Litchfield Rd Goodyear, AZ (we haven't opened the Fallas store yet)
>
> […].

Thus, nearly three years after the Goodyear Property was acquired, the Debtors were still paying rent on a phantom, i.e., nonexistent store.

309.     In total, the Debtors paid $1,076,838.58 on account of phantom "Store #414."  *See* Exhibit B.  The Debtors received no value for making these rent payments, and were insolvent, operating with unreasonably small capital, and incurring debts beyond their ability to pay throughout the time they were being made.

310.     Rather than providing a benefit to the Debtors, the rent payments made in connection with the Goodyear Property were instead made for the benefit of 409 Litchfield Road LLC and the Fallases, to pay down the RBS Citizens debt and to make partner distributions to Michael and Ilanit Fallas.  The Profit and Loss Statement for 409 Litchfield Road LLC reflects net income of $162,240.69 for the period August-December 2013 and $351,540 for 2014, which included the phony rents paid by the Debtors.

### D.     Additional Claims Against Fallas

#### 1.     Dividends Paid to Fallas While the Debtors Were Insolvent

311.     Notwithstanding the Debtors' insolvency in the wake of the Conway Acquisition, in January 2015 Debtors J & M Sales and FP Stores issued more than $7.6 million in dividend payments to Fallas, his wife, and trusts under their control.

312.     On January 31, 2015, when the Debtors were insolvent, Fallas and his wife Ilanit, in their capacities as the directors of J & M Sales and as the trustees of trusts holding 100% of the common stock in J & M Sales, signed a document entitled "Unanimous Written Consent of the Shareholders and Board of Directors," which authorized, *inter alia*, "a dividend of $6,474.375 per share . . . to all shareholders of record as of January 31, 2015, who are the holders of the Company's 40 outstanding shares of one class common stock."  This dividend amounted to $258,975 total, split as follows: (i) $129,487.50 to "The Michael Fallas Living Trust dated 1/19/05," which held 20 shares of J & M Sales common stock and of which Fallas was trustee; and (ii) $129,487.50 to "The Ilanit Fallas Living Trust dated 1/19/05," which held 20 shares of J & M Sales common stock and of which Ilanit was trustee (collectively, the "J & M Sales Dividend").

313.     Similarly, on January 31, 2015, Fallas and Ilanit executed another "Unanimous Written Consent of the Shareholders and Board of Directors" for FP Stores, in their capacity as the sole directors and shareholders of FP Stores.  This document authorized "a dividend of $741.9227 per share . . . to all shareholders of record as of January 31, 2015, who are the holders of the Company's 10,000 outstanding shares of one class common stock."  The divided amounted to $7,419,227 total, as follows: (i) $3,709,613.50 to "The Michael Fallas Living Trust dated 1/19/05," which held 5,000 shares of FP Stores common stock and of which Fallas was trustee; and (ii) $3,709,613.50 to "The Ilanit Fallas Living Trust dated 1/19/05," which held 5,000 shares of FP Stores and of which Ilanit was trustee (collectively, the "FP Stores Dividend").

314.     Although the corresponding Unanimous Written Consents were dated January 31, 2015, upon information and belief approximately $7.4 million of the dividends had actually been paid earlier, as set forth below:

      a.      Transfer by J & M Sales on April 15, 2014 in amount of $671,502, paid to California Franchise Tax Board;

      b.      Transfer by J & M Sales on April 17, 2014 in amount of $4,224,922, to Fallas' personal Bank of America account; and

      c.      Transfer by J&M Sales on June 12, 2014 in amount of $2,463,000, to Fallas' personal Bank of America account.

315.     As noted above, these amounts were all paid by Debtor J & M Sales, even though the subsequent Unanimous Written Consents purportedly authorized $7.4 million in dividends from Debtor FP Stores – providing yet another example of the Fallases' failure to observe corporate boundaries between the Debtor entities.

316.     Fallas and Ilanit authorized and paid these dividends to themselves when the Debtors were insolvent, operating with unreasonably small capital, and had incurred or intended to incur debts well beyond their ability to pay, in connection with the Conway Acquisition.  The issuance of the J & M Sales Dividend and the FP Stores Dividend further worsened the Debtors' financial condition by depleting the Debtors' capital at a time when the business was drowning.

317.     The Debtors did not receive reasonably equivalent value in exchange for the J & M Sales Dividend or the FP Stores Dividend, which were made on account of the respective equity interests in J & M Sales and FP Stores held by the above-identified trusts under the Fallases' control.  No value was transferred to J & M Sales or FP Stores in exchange for the dividends.

      **2.**      **Fallas's Secured Claims Are Perfected During the Preference Period**

318.    As of the Petition Date, Fallas held $10 million total in secured debt against Debtor
Southern Island, and $5 million in secured debt against Debtors J & M Sales, National Stores,
J&M Texas, FP Stores, SI Retail, Caribbean Island, and Pazzo FNB, pursuant to two Promissory
Notes.

319.    The first Promissory Note was issued June 13, 2017 by Debtor Southern Island to
Fallas, in the amount of $5 million (the "June 2017 Note").  Under the June 2017 Note, Southern
Island granted Fallas a security interest in substantially all of Southern Island's personal property.

320.    The second Promissory Note – also in the amount of $5 million – was issued to
Fallas on March 13, 2018 by Debtors Southern Island, J & M Sales, National Stores, J&M Texas,
FP Stores, SI Retail, Caribbean Island, and Pazzo FNB (the "March 2018 Note"), and similarly
granted Fallas a security interest in substantially all of those Debtors' personal property.

321.    The June 2017 Note and March 2018 Note were subject to subordination
agreements between Fallas and the Debtors' largest secured creditors, Encina Business Credit,
LLC and Gordon Brothers Finance Company.

322.    Although the June 2017 Note and March 2018 Note purport to grant Fallas security
interests in much of the Debtors' property, Fallas did not perfect his security interest in that
property until June 11, 2018.

323.    On June 11, 2018, Fallas filed a UCC-1 financing statement, File No. 20183950850
(the "Fallas UCC-1"), against Debtors Southern Island, J & M Sales, National Stores, J&M Texas,
FP Stores, SI Retail, Caribbean Island, and Pazzo FNB, listing the collateral as all of the assets of
each Debtor including (a) all accounts, chattel paper, deposit accounts, documents, equipment,
general intangibles, instruments, inventory, investment property, letter of credit rights, commercial

tort claims, books and records, all other goods, and all proceeds.  Fallas's filing of the Fallas UCC-1 on June 11, 2018 is referred to herein as the "Fallas Lien Transfer."

### E.      Pegasus Fails to Preserve the Debtors' Books and Records

324.    Since the Trustee's appointment in February 2019, he has been attempting to obtain a complete set of the Debtors' records from Pegasus – another entity owned and controlled by Fallas, which purchased certain assets of the Debtors, including 85 of the Debtors' store locations, and has possession of the servers on which the Debtors' records are stored.

325.    Following the Debtors' Chapter 11 bankruptcy filings in August 2018, the Debtors and Pegasus entered into an Asset Purchase Agreement dated as of October 4, 2018 (the "Pegasus APA"), pursuant to which Pegasus would purchase 85 of the Debtors' store locations, among other specified assets.  The Pegasus APA refers to the Debtors as "Sellers" and to Pegasus as "Buyer."

326.    The sale to Pegasus was approved by the Bankruptcy Court on October 17, 2018, and closed on October 19, 2018.

327.    Pursuant to Section 2.1(f) of the Pegasus APA, the assets purchased by Pegasus included "All Documents of Sellers," other than documents "solely or predominantly related to" assets excluded from the sale or documents expressly excluded under Section 2.2.  Documents subject to the Debtors' attorney-client privilege and/or the work product doctrine are among those excluded from the sale, under Section 2.2(f).

328.    Section 2.7(b) of the Pegasus APA provides as follows:

> Buyer will retain and make available to Sellers or other bankruptcy estate representative and their respective representatives acting on behalf of Sellers' estates, for a period of two (2) years following the Closing Date (or longer if reasonably requested), at Sellers' sole cost and expense, the Documents delivered by Sellers to Buyer and other files of Buyer pertaining to (i) the conduct of the Specified Locations or ownership of the Purchased Assets prior to the Closing Date and (ii) the Excluded Assets and Excluded

Liabilities if reasonably needed by Sellers for liquidation, winding up, litigation, Tax reporting or other proper purposes.

329. Section 7.1(h) of the Pegasus APA also required Pegasus to provide the Debtors with certain reports relating to Pegasus's activities with respect to dispositions of Additional Leases (as defined in the Pegasus APA), and provided the Debtors with the right to audit records relating thereto.

330. In Section 8.5 of the Pegasus APA, Pegasus and the Debtors further agreed to preserve (and make available to the other parties as reasonably required) the books and records in their respective possession pertaining to the acquired business for 2 years following the closing, unless notice, a response period, and the opportunity to take possession of the records are provided to the other party.

331. Since closing, Pegasus has operated from the Debtors' former headquarters and all of the Debtors' records – including the servers which the Debtors used during the time they were operating (the "Servers") – have been in Pegasus's possession and under its control. This includes all of the Debtors' electronic records, documents, communications, invoices, financial data, payment records, and related information (referred to collectively herein as, the "Records").

332. Following the sale to Pegasus, the Debtors had no ongoing business operations. Substantially all of the Debtors' other assets had been liquidated in accordance with certain agency agreements approved by the Bankruptcy Court in an order dated October 12, 2018.

333. Following conversion of the Debtors' bankruptcy cases from Chapter 11 to Chapter 7 in February 2019, the Trustee immediately began requesting documents from Pegasus. Initially Pegasus provided hard copies of certain records, including bank statements from August 2016 through the Petition Date and certain trial balance/general ledger reports for 2016, 2017 and 2018.

71

334.    Thereafter, SierraConstellation Partners, LLC, former consultants to the Debtors, provided an email backup server (containing .pst files for each custodian) and backup tapes containing limited accounting data.  However, these materials did not contain all of the Debtors' Records.

335.    The Trustee, in an effort to avoid piecemeal or incomplete production of materials, reasonably requested to image the entire servers on which the Debtors' Records are stored, in order to ensure his access to all necessary electronic information needed to carry out his duties on behalf of the estates.

336.    On April 1, 2019, the Trustee's counsel emailed Pegasus's counsel regarding the Trustee's requests for Records, explaining:

> [T]he Trustee is seeking to image/copy all of the Debtors' electronic records in the possession of Pegasus Trucking.  To date, we have been provided only with an email backup server and certain accounting data on backup tapes (which are unreadable and inaccessible in their current form).  We are requesting Debtors' word, excel, pdf and other files as maintained in the ordinary course of business.  We have not been provided any of those documents to date.

337.    On May 7, 2019, the Trustee's counsel again emailed Pegasus's counsel, explaining that notwithstanding Pegasus's prior production of certain documents, "the Chapter 7 Trustee is seeking to image/copy all of the Debtors' electronic records in the possession of Pegasus Trucking. As we previously discussed the Chapter 7 Trustee has IT consultants who can help to facilitate this request with your client."

338.    After still not receiving the requested non-email electronic Records, the Trustee's counsel again explained on August 16, 2019 that the Trustee was still waiting on "the Debtors' word, excel, pdf and other electronically stored information" and, as previously requested, "needs to image all servers and other hard drives in the possession of Pegasus."

339.    In September 2019, the Trustee learned for the first time that Pegasus had been using the same Servers since the sale, so that the Debtors' pre-sale data was potentially commingled with Pegasus's post-sale data.  In a September 6, 2019 email, Pegasus's counsel informed the Trustee's counsel that "As expected, Pegasus is now using the same servers so there is a concern about giving access to non estate records."  In response, the Trustee's counsel advised that "As discussed, we have a forensic computer consultant prepared to come on site and handle this matter (with consultation with my firm's IT folks)."

340.    On September 18, 2019, Pegasus's counsel informed the Trustee's counsel that the parties could "work this out," *if* the Trustee would consent and stipulate to 8 conditions demanded by Pegasus, which were not required by the Pegasus APA and went well beyond any requirement contained therein.  Nonetheless, the Trustee negotiated in good faith with Pegasus in an attempt to reach an agreement concerning imaging of the Servers.  With respect to the first condition, the Trustee initially had difficulty finding a vendor with "PCI" (*i.e.*, payment card industry data security standards used by businesses processing credit card transactions) compliance, given that such compliance is not typically required in the e-discovery arena.

341.    On June 5, 2020, the Trustee filed a motion to compel Pegasus to turnover the Records to the Trustee, in compliance with the Pegasus APA.  To that point, the parties had still been unable to reach a reasonable resolution regarding imaging of the Servers, due to Pegasus's stonewalling of the Trustee's efforts.

342.    Following the filing of the motion to compel, Pegasus finally agreed to reach a compromise regarding the conditions it demanded.  The parties reached an agreement (including the identification of an e-discovery vendor acceptable to all parties), which was set forth in a Stipulation filed with the Bankruptcy Court on June 22, 2020 and approved the following day (the

"Stipulation").  The Stipulation sets forth the parties' agreed-to conditions for the imaging of the Servers, which included, *inter alia*, that "[t]he Trustee will hire a PCI-compliant e-discovery vendor (the "Vendor") agreeable to Pegasus to access the Servers" and that "[t]he Vendor may access and copy the Servers on or before June 28, 2020."

343.    The Trustee hired BDO USA, LLP ("BDO") as the vendor to perform the imaging of the Servers.  The hiring of BDO was acceptable to Pegasus – indeed, Pegasus had identified and recommended BDO as an appropriate vendor.

344.    Following entry of the Stipulation, BDO and the Trustee's counsel engaged in conversations with various Pegasus-affiliated IT professionals to set up imaging of the Servers, but were informed by Pegasus – for the first time – that the bulk of the data contained on the Servers was actually inaccessible and unusable because it had been infected with ransomware.

345.    On July 2, 2020, the Trustee's counsel emailed Pegasus's counsel seeking an explanation regarding the specific issues afflicting the data, the timing of when the issues arose, when Pegasus's lawyers became aware of the issues, and what steps were being taken to rectify the issues.  To date, Pegasus's counsel has not provided a substantive response

346.    Despite the parties' numerous conversations over the course of the prior sixteen months regarding the Debtors' Records and the Servers, the week of July 2, 2020 was the first time any representative of Pegasus notified the Trustee or his representatives about ransomware, malware, viruses, or other issues preventing access to the Servers or the Debtors' Records.  Pegasus also failed to disclose that ransomware, malware, viruses, or other issues prevented access to the Servers or the Debtors' Records when the parties agreed to and submitted the Stipulation to the Bankruptcy Court.

74

347.    To date, BDO has only been able to extract a limited amount of data from the Servers, which is in the process of being forensically evaluated.  BDO has been unable to extract all of the Debtors' Records from the Servers, due to the aforementioned issues with ransomware and other viruses.

348.    Due to Pegasus's evasiveness with respect to production of the Records and spoliation of their contents, the Trustee lacks a complete set of the Debtors' Records, which has frustrated (and will continue to frustrate) his ability to fully evaluate a range of topics regarding the Debtors' affairs, including but not limited to transactions relating to the claims set forth and potential misconduct by the Defendants – including by Defendant Fallas, who has complete dominion and control over Pegasus's operations.[3]

   **F.    Facts Supporting Tolling Principles**

349.    The Debtors had no independent board members or managers and the Fallases dominated the companies.

350.    As privately held companies dominated by the Fallases, the Debtors' minutes, board resolutions and financial records were not available to creditors.

351.    Defendant Fallas exercised complete dominion and control over all aspects of the Debtors' business, ruling by fiat and making all decisions concerning the Debtors' transactions and use of funds.  Ilanit, on the other hand, took no active role in the Debtors' affairs, abdicating her role and duties as a fiduciary.

---

[3]    The Trustee is continuing to investigate issues relating to the accessibility of the Debtors' Records and to Pegasus's misconduct (including but not limited to breaches of the Pegasus APA) in connection therewith, and reserves his right to assert claims relating thereto against Pegasus and/or any other party, as appropriate.

352.     The Fallases failed to enact or implement oversight measures or procedures and failed to appoint independent Board members or managers that could have protected the Debtors' interests, investigated the unlawful conduct described herein, and/or enabled the Debtors to assert claims in connection with the Fallases' unlawful behavior.

353.     Through his domination of the Debtors' affairs, Fallas fraudulently concealed the wrongdoing alleged herein – including the Fallases' breaches of fiduciary duty in connection with the Conway Acquisition and their authorization and implementation of the self-interested transactions at issue – through and until the Petition Date.

354.     Prior to the Petition Date, the Fallases themselves were the only individuals in a position or with the information necessary to assert claims on behalf of the insolvent Debtors for the benefit of the Debtors and their creditors.

355.     The Fallases' unlawful behavior – which the Fallases made no effort to reform and which caused damage to and the ultimate destruction of the Debtors – was part of a course of conduct that continued unabated through the Petition Date.

## V.     THE CLAIMS

**FIRST CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS**
**(CONWAY ACQUISITION & PAYMENTS TO CONWAY CREDITORS)**
**Pursuant to 6 Del. C. §§ 1304(a) & 1305(a), and 11 U.S.C. §§ 544 & 550**
**(Against Conway Sellers, KeyBank, Conway Creditors, and Factor Defendants)**

356.     Paragraphs 1 through 355, above, are incorporated herein by reference, as if restated in their entirety.

357.     As set forth in detail above, the Trustee seeks to: (i) avoid the Debtors' assumption of approximately $46 million of Conway liabilities in connection with the Conway Acquisition, and recover the value of the assumed liabilities from the Conway Sellers; (ii) avoid Pazzo FNB's purchase of Conway's $11.7 million obligation to FNCF (the successor to which is KeyBank) and

recover transfers made in connection therewith; and (iii) avoid all obligations associated with the Conway Acquisition and avoid and recover the $13,463,332.34 (or more to the extent hereafter identified) that the Debtors paid in connection with Conway Creditor claims, and recover the value of each from the respective Conway Creditor or Factor Defendant to whom the payment was made (as set forth on Exhibit A).

358.    The Debtors' assumption of liabilities in connection with the Conway Acquisition (including the FNCF obligation and Conway's trade debt) are avoidable, as are the Debtors' payments to Conway Creditors and Factor Defendants as "transfers" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

359.    At all times material hereto, the Debtors had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the Debtors' assumption of liabilities in connection with the Conway Acquisition and the Debtors' payments to or on behalf of Conway Creditors (collectively, the "Predicate Creditors").

360.    The following are examples of Predicate Creditors of Debtors Southern Island and SI Retail that could have avoided the transfers associated with the Conway Acquisition and the payments to or on behalf of Conway Creditors as of the Petition Date: Marshalls of MA, Inc.; Marshalls of IL, LLC; The TJX Companies, Inc.; Concord Buying Group, Inc.; and WHLR-JANAF, LLC.    Additional Predicate Creditors of Debtor Southern Island include, without limitation, UE Bruckner Shops LLC and ABG Accessories.    Additional Predicate Creditors of Debtor SI Retail include, without limitation: S&S Shopping Centers, Ltd.; KOP Perkins Farm Marketplace LLC; Shop City PW/LB, LLC; Wasa Propery Southlake Pavilion LLC; East Forest

Plaza II, LLC; Edgewood Station LLC; Amherst Station II LLC; 1204 Corporation; DEL, LLC; and G&I IX Empire Thruway Plaza LLC.

361.     The following are additional examples of Predicate Creditors for all the Debtors (including but not limited to Debtor J & M Sales, which funded the purchase price for the FNCF obligation): Kidz Concepts, LLC; Banjo Wear LLC; HDS Trading Corp.; Home Fashion Distributors; Fishman & Tobin Inc.; Bermo Enterprises; and Strategic Partners.  Additionally, the California Franchise Tax Board is a predicate creditor of Debtor Pazzo FNB.

362.     News articles at the time of the Conway acquisition noted that "details of the transaction were unclear."  *See* https://www.fierceretail.com/operations/report-conway-sold-to-national-stores-inc-entire-buying-office-staff-laid-off.

363.     The Predicate Creditors had not discovered and could not have reasonably discovered the fraudulent nature of the transfers prior to one year before the Petition Date.

364.     Accordingly, the actual fraudulent transfers as to these Predicate Creditors are avoidable pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*, even where those transfers took place more than four years prior to the Petition Date.

365.     Moreover, certain predicate creditors of Debtor Southern Island are government entities that are not subject to the limitations period set forth in the Bankruptcy Code or in 6 Del. C. § 1309 (the "Government Predicate Creditors").  These Government Predicate Creditors include, but are not limited to, the following:

a.     The Ohio Department of Taxation, which "is exempt from the operation of a generally worded statute of limitations."  *See State v. Sullivan*, 527 N.E.2d 798, 801 (Ohio 1988).

b.   The Pennsylvania Department of Labor and Industry, which filed a claim against Southern Island Stores, LLC for unemployment taxes and interest. Pennsylvania law recognizes the doctrine of *nullum tempus*, under which the Commonwealth and certain subdivisions (which includes executive departments by statutory definition) are not subject to any statute of limitations, so long as the Commonwealth is acting to vindicate public rights and protect public property. *See, e.g.*, *Smith v. Mognet*, 618 A.2d 1215, 1217 (Pa. Comm. Ct. 1992); *see also Comm., Dep't of Transp. v. J.W. Bishop & Co.*, 439 A.2d 101, 101 (Pa. 1981) (reaffirming "the long-standing rule that [statutes of limitations] do not apply to the Commonwealth unless the statute specifically so provides").

366.   Accordingly, obligations, along with actual and constructive fraudulent transfers, are avoidable by these Government Predicate Creditors pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*, even where those transfers took place more than four years prior to the Petition Date.

367.   At all times material hereto, the Debtors were insolvent or rendered insolvent as a result of the Conway Acquisition and payments to Conway Creditors and Factor Defendants, had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

368.   The Debtors did not receive reasonably equivalent value in exchange for the Conway Acquisition or the payments made to Conway Creditors and Factor Defendants.

369.   Accordingly, the Debtors' assumption of liabilities in connection with the Conway Acquisition and the Debtors' payments to Conway Creditors and Factor Defendants (as specified

on Exhibit A) constitute avoidable obligations and constructively fraudulent transfers pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Section 544 of the Bankruptcy Code.

370.    Furthermore, the Debtors entered into the Conway Acquisition and made the payments to Conway Creditors and Factor Defendants with the actual intent to hinder, delay, and/or defraud the Debtors' creditors, including but not limited to insofar as the Conway Acquisition (from which payments to Conway Creditors flowed) was intended as a bail out for the Conway Creditors without regard for and at the expense of the Debtors and their creditors.

371.    Accordingly, the Debtors' assumption of liabilities in connection with the Conway Acquisition and the Debtors' payments to Conway Creditors and Factor Defendants (as specified on Exhibit A) constitute avoidable obligations and actually fraudulent transfers pursuant to 6 Del. C. §§ 1304(a)(1), and Section 544 of the Bankruptcy Code.

372.    As more particularly set forth above, the Conway Sellers, KeyBank, the Conway Creditors, and the Factor Defendants were initial transferees or the entities for whose benefit the above-referenced transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

373.    Accordingly, the Trustee is entitled to recover the above-referenced transfers or their value pursuant to Section 550 of the Bankruptcy Code.

### SECOND CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### (J & M SALES DIVIDEND AND FP STORES DIVIDEND)
### Pursuant to 6 Del. C. §§ 1304(a) & 1305(a), and 11 U.S.C. §§ 544 & 550
### (Against Michael and Ilanit Fallas)

374.    Paragraphs 1 through 373, above, are incorporated herein by reference, as if restated in their entirety.

375.    As set forth in detail above, the Trustee seeks to avoid the J & M Sales Dividend and the FP Stores Dividend and recover the value thereof from the Fallases (and their trusts).

376.     The J & M Sales Dividend and the FP Stores Dividend were "transfers" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

377.     At all times material hereto, Debtors J & M Sales and FP Stores had at least one Predicate Creditor holding an allowable claim who, but for the Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the J & M Sales Dividend and the FP Stores Dividend, including but not limited to Government Predicate Creditors as set forth below:

    a.    The Ohio Bureau of Workers' Compensation, which filed a claim against J & M Sales and is a state agency "exempt from the operation of a generally worded statute of limitations." *See State v. Sullivan*, 527 N.E.2d 798, 801 (Ohio 1988).

    b.    The New Mexico Taxation & Revenue Department, which filed claims against J & M Sales and J&M Texas. *See State v. Roy*, 68 P.2d 162, 164-65 (N.M. 1937) ("It is generally held that statutes of limitation do not apply to actions in behalf of the State, unless it is specifically so provided in the statute…."); *In re Valdez*, 136 B.R. 874, 876 (Bankr. D.N.M. 1992) ("New Mexico follows the common law principle and has held that statutes of limitation ordinarily do not run against the state." (quotations omitted)).

    c.    The Arizona Department of Revenue, which filed claims against J & M Sales, FP Stores, and J&M Texas. *See Kerby v. State ex rel. Frohmiller*, 157 P.2d 698, 704 (Ariz. 1945) (noting the established rule that statutes of limitations "do not run or operate against the state"); *City of Bisbee v. Cochise County*, 78 P.2d 982 (Ariz. 1938) (in actions to recover taxes, state and its subdivisions are not subject to statute of limitations).

d.   The Illinois Department of Revenue, which filed a claim against FP Stores. *See In re Estate of Deuth*, 992 N.E.2d 180, 182 (Ill. App. Ct. 2013) ("Under the common law, when a governmental unit acts in a public capacity . . . a statute of limitations may not be asserted against the government unless the statute expressly applies to claims brought by the government."); *Clare v. Bell*, 37 N.E.2d 812, 814 (Ill. 1941) (statute of limitations did not apply to state's right to collect revenues by taxation).

e.   The Comptroller of Maryland, which filed a claim against FP Stores. *See Anne Arundel County v. McCormick*, 594 A.2d 1138, 1141 (Md. Ct. App. 1991) ("The ancient common law maxim of *nullum tempus occurrit regi* has been adopted in [Maryland] and exempts the State and its agencies from the bar of a statute of limitations . . . which does not expressly bar the State or its agencies.").

378.   Accordingly, actual and constructive fraudulent transfers are avoidable by these Government Predicate Creditors pursuant to 11 U.S.C. § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*, even where those transfers took place more than four years prior to the Petition Date.

379.   Moreover, the Debtors' general unsecured creditors, including but not limited to the Government Predicate Creditors set forth above, could not have known about the fraudulent nature of the J & M Sales Dividend or FP Stores Dividend prior to the Petition Date because, as set forth more particularly above, the Fallases were the only shareholders and board members of the privately-held Debtors and the Debtors' board resolutions and financial records were not available to creditors.

82

380.     At all times material hereto, the Debtors (particularly Debtors J & M Sales and FP Stores) were insolvent or rendered insolvent as a result of the J & M Sales Dividend and the FP Stores Dividend, had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

381.     The Debtors did not receive reasonably equivalent value in exchange for the J & M Sales Dividend and the FP Stores Dividend.

382.     The Debtors made the J & M Sales Dividend and the FP Stores Dividend with the actual intent to hinder, delay, and/or defraud the Debtors' creditors.

383.     Accordingly, the J & M Sales Dividend and the FP Stores Dividend constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304(a) and 1305(a), and Section 544 of the Bankruptcy Code.

384.     As more particularly set forth above, the J & M Sales Dividend and the FP Stores Dividend were made to the "The Michael Fallas Living Trust dated 1/19/05" and "The Ilanit Fallas Living Trust dated 1/19/05," of which Fallas and Ilanit are trustees, respectively.  These trusts, of which Defendants Fallas and Ilanit are trustees, were the initial transferees or the entities for whose benefit the J & M Sales Dividend and the FP Stores Dividend were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

385.     Accordingly, the Trustee is entitled to recover the J & M Sales Dividend and the FP Stores Dividend, or their value, pursuant to Section 550 of the Bankruptcy Code.

### THIRD CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS (FRAUDULENT RENT PAYMENTS)
### Pursuant to 6 Del. C. §§ 1304(a) & 1305(a), and 11 U.S.C. §§ 544 & 550
### (Against the Fallas SPEs)

386.     Paragraphs 1 through 385, above, are incorporated herein by reference, as if restated in their entirety.

387.     As set forth in detail above, the Trustee seeks to avoid all rent payments made to Fallas-Owned Properties (as identified on Exhibit B), including rent payments made on account of a nonexistent store in Goodyear, Arizona (collectively, the "Fraudulent Rent Payments"), and recover the value thereof from the Fallas SPE transferee to whom each respective payment was made.

388.     The Fraudulent Rent Payments were "transfers" within the meaning of 6 Del. C. § 1301(12) and 11 U.S.C. § 101(54).

389.     As set forth above, at all times material hereto, the Debtors had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filings, would have standing to bring claims to avoid and recover the Fraudulent Rent Payments.

390.     In addition to the Predicate Creditors and Government Predicate Creditors of the Debtors that are identified above, additional Government Predicate Creditors of Debtor National Stores include Dallas County (Texas) and Tarrant County (Texas), which are not subject to the statute of limitations.  *See Waller v. Sanchez*, 618 S.W.2d 407, 409 (Tex. Ct. App. 1981) ("[S]tatutes of limitations do not run against the State or its units of government."); *Shields v. State*, 27 S.W.3d 267, 275 (Tex. Ct. App. 2000) ("[I]t is well settled that the State in its sovereign capacity is not subject to the defense of limitations.").

391.     The Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Rent Payments, which were made when the Debtors were insolvent (or rendered insolvent as a result thereof), had unreasonably small capital, and/or had incurred or intended to incur debts beyond their ability to pay as such debts matured.

392.     The Debtors made the Fraudulent Rent Payments with the actual intent to hinder, delay, and/or defraud the Debtors' creditors.

393.     By having the Debtors make Fraudulent Rent Payments (which exceeded market value) to Fallas SPEs, Fallas intentionally used the Debtors' assets to benefit insiders (which he also owned and controlled) and their lenders, rather than for the benefit of the Debtors and their creditors.

394.     Accordingly, the Fraudulent Rent Payments constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304(a) and 1305(a), and Section 544 of the Bankruptcy Code.

395.     As more particularly set forth above and in Exhibit B, the Fallas SPEs were initial transferees or the entities for whose benefit the Fraudulent Rent Payments were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

396.     Accordingly, the Trustee is entitled to recover the Fraudulent Rent Payments or their value pursuant to Section 550 of the Bankruptcy Code.

### FOURTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS (PAYMENTS TO CONWAY CREDITORS, FACTOR DEFENDANTS & FALLAS SPEs) Pursuant to 11 U.S.C. §§ 548(a)(1) & 550 (Against Conway Creditors, Factor Defendants, and Fallas SPEs)

397.     Paragraphs 1 through 396, above, are incorporated herein by reference, as if restated in their entirety.

398.     As set forth in detail above, the Trustee seeks to avoid (i) payments made to Conway Creditors (or to Factor Defendants on behalf of Conway Creditors) and (ii) Fraudulent Rent Payments.

399.     Certain payments to Conway Creditors and Factor Defendants and certain Fraudulent Rent Payments were made on or after August 6, 2016 (as specified in Exhibits A and B attached hereto), and thus were made on or within the two (2) year period preceding the Petition

Date. Payments made to Conway Creditors, Factor Defendants, and Fallas SPEs on or after August 6, 2016 are referred to herein as the "Two-Year Transfers."

400. Each of the Two-Year Transfers was a "transfer" within the definition of 11 U.S.C. § 101(54).

401. Each of the Two-Year Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the Defendants.

402. As more particularly set forth above, the Debtors did not receive reasonably equivalent value in exchange for the Two-Year Transfers.

403. As more particularly set forth above, the Two-Year Transfers were made at a time when the Debtors were insolvent (or rendered insolvent as a result of the Two-Year Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

404. The Two-Year Transfers were made with actual intent to hinder, delay, and/or defraud the Debtors' creditors.

405. Accordingly, the Two-Year Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1) of the Bankruptcy Code.

406. As more particularly set forth above and in Exhibits A and B, the Conway Creditors, the Factor Defendants, and the Fallas SPEs were initial transferees or the entities for whose benefit the Two-Year Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

407. Accordingly, the Trustee is entitled to recover the Two-Year Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## FIFTH CLAIM – UNJUST ENRICHMENT
### (Against Conway Sellers, KeyBank, Conway Creditors, Factor Defendants, Michael and Ilanit Fallas, and Fallas SPEs)

408.    Paragraphs 1 through 407, above, are incorporated herein by reference, as if restated in their entirety.

409.    To the extent the Conway Sellers, KeyBank, Conway Creditors, Factor Defendants, Fallas, Ilanit, and the Fallas SPEs received fraudulent transfers identified in Counts One through Four above, each of those transfers conferred a benefit on the Defendant which received it, and such Defendant unjustly retained that benefit at the expense of the Debtors' estates.

## SIXTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### (FALLAS LIEN TRANSFER)
### Pursuant to 11 U.S.C. §§ 547(b)
### (Against Fallas)

410.    Paragraphs 1 through 409, above, are incorporated herein by reference, as if restated in their entirety.

411.    The Trustee seeks to avoid the Fallas Lien Transfer as a preferential transfer.

412.    The Fallas Lien Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54).

413.    As more particularly set forth above, the Fallas Lien Transfer was made on June 11, 2018, during the ninety (90) day period immediately preceding the Petition Date, and was made to an insider within the one (1) year period immediately preceding the Petition Date.

414.    As more particularly set forth above, the Fallas Lien Transfer was made on account of antecedent debt, as it was made on account of the June 2017 Note and the March 2018 Note.

415.    Because the grant of Fallas's security interest was perfected more than thirty (30) days after the issuance of the June 2017 Note or March 2018 Note, the date of perfection (*i.e.*, the

filing of the Fallas UCC-1, on June 11, 2018), rather than the date on which the Notes were issued, is the operative date of the Fallas Lien Transfer, pursuant to 11 U.S.C. § 547(e)(2)(B).

416.    The Fallas Lien Transfer was made at a time when the Debtors were insolvent.

417.    The Fallas Lien Transfer was made to or for the benefit of a creditor and enabled that creditor to receive more than he would have received if the Fallas Lien Transfer had not been made.

418.    Accordingly, the Trustee is entitled to avoid the Fallas Lien Transfer pursuant to Section 547 of the Bankruptcy Code.

## SEVENTH CLAIM – BREACH OF FIDUCIARY DUTY
### (Against Michael and Ilanit Fallas)

419.    Paragraphs 1 through 418, above, are incorporated herein by reference, as if restated in their entirety.

420.    Defendants Fallas and Ilanit owed fiduciary duties of loyalty and care to the Debtors.

421.    Given that Fallas and Ilanit controlled the Debtors, that the Debtors operated as a single enterprise, and that corporate formalities between the Debtors were often blurred or ignored, it was often unclear which Debtor Fallas and/or Ilanit were acting on behalf of at any given time. However, the Fallases owed fiduciary duties to all Debtors, and their breaches of fiduciary duty caused harm to all Debtors, as set forth herein.

422.    The duty of loyalty obligated Fallas and Ilanit to commit themselves to the business of the Debtors with the attitude of promoting the interests of the Debtors and not themselves.

423.    The duty of loyalty is breached, *inter alia*: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities;

88

(b) when a fiduciary "abdicates" his fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

424. The duty of care is breached, *inter alia*: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of "gross negligence."

425. Fallas breached his fiduciary duties to the Debtors by, *inter alia*:

a. Failing to conduct appropriate due diligence in connection with the Conway Acquisition and/or consciously disregarding information (which Fallas knew or should have known) regarding the harm the Conway Acquisition would cause to the Debtors;

b. Authorizing the Debtors' entry into the Conway Acquisition, including but not limited to the Debtors' assumption of nearly $46 million in liabilities;

c. Authorizing fraudulent and/or preferential transfers made on behalf of the Debtors as set forth herein, including but not limited to transfers made for Fallas's personal benefit;

d. Charging and authorizing payment of Fraudulent Rent Payments to Fallas SPEs, which exceeded market value and benefited the Fallases and the Fallas SPEs at the Debtors' expense;

e. Authorizing the J & M Sales Dividend and FP Stores Dividend, which benefited Fallas, his family, and trusts under their control at the Debtors' expense; and

f. Using Debtor employees to perform various functions for Fallas-controlled non-Debtor entities and for the Fallases personally.

426.    Ilanit breached her fiduciary duties to the Debtors by abdicating and disregarding her fiduciary responsibilities.  Upon information and belief, despite nominally being a member of the Board of Directors, Ilanit took no active or meaningful role in the Debtors' affairs or decision-making, and instead left all such decisions (including but not limited to those regarding disposition and use of the Debtors' assets) to Fallas and simply executed resolutions or other documents from time to time at the behest of Fallas.  Ilanit's failure to take any active role in connection with the Debtors' affairs or any actions to prevent the harms to the Debtors described herein (many of which involved payments, distributions, and other transactions that benefitted Ilanit personally) exhibits an abdication of and gross negligence in connection with her fiduciary duties.

427.    The conduct of the Fallases, as alleged herein, was intentional, reckless, or grossly negligent.

428.    At all times relevant hereto, the Fallases engaged in self-dealing, prioritizing their own interests and the interests of non-Debtor Fallas Enterprise entities over the interests of the Debtors.

429.    The Fallases were the only board members, managers and equityholders of the privately-held Debtors, and their board resolutions and financial records were not available to creditors.  Michael Fallas exercised complete dominion and control over all aspects of the Debtors' business.  As such, prior to the Petition Date, the Fallases themselves were the only individuals in a position to or with the information necessary to sue on behalf of the Debtors.

430.    As a result of the various breaches of fiduciary duty described above, the Debtors have suffered damages in an amount to be determined at trial.

## EIGHTH CLAIM – AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Fallas SPEs)

431.    Paragraphs 1 through 430, above, are incorporated herein by reference, as if restated in their entirety.

432.    As more particularly set forth above, the Fallases owed fiduciary duties to the Debtors.

433.    As more particularly set forth above, Fallas breached his fiduciary duties to the Debtors by, *inter alia*, charging and authorizing the Debtors' payment of the Fraudulent Rent Payments to the Fallas SPEs, for the purpose of benefiting the Fallas SPEs and, thereby, the Fallases (given their ownership of the Fallas SPEs).

434.    The Fallas SPEs knowingly participated in Fallas's scheme to enrich himself and his family through the Debtors' payment of the Fraudulent Rent Payments, which were inflated and in excess of market value, and through the other self-dealing and wrongdoing alleged herein.

435.    The Fallas SPEs' knowing participation in the scheme is demonstrated by, *inter alia*: (i) their role as the entities through which Fallas carried out his scheme to charge and collect the Fraudulent Rent Payments from the Debtors and engage in other wrongdoing detailed herein; (ii) the improper benefits they received as a result of the scheme, which included, *inter alia*, increased cash flow, higher "profits," and improved relationships with lenders (all at the Debtors' expense); and (iii) Fallas's overarching control over the Fallas SPEs.

436.    As a result of the Fallases' breaches of fiduciary duty and the Fallas SPEs' knowing participation therein, the Debtors have suffered damages, which include but are not limited to the millions of dollars' worth of Fraudulent Rent Payments paid by the Debtors.

### NINTH CLAIM – DECLARATORY RELIEF (PIERCING THE CORPORATE VEIL)
**(Against Defendants Michael and Ilanit Fallas and the Fallas SPEs)**

437.    Paragraphs 1 through 436, above, are incorporated herein by reference, as if restated in their entirety.

438.    The corporate form should be disregarded as between Defendants Michael and Ilanit Fallas, the Fallas SPEs and the Debtors because, as more particularly set forth herein, the facts show that corporate boundaries were ignored to favor the interests of the Fallases and the Fallas SPEs over the interests of the Debtors and their creditors and to perpetrate a fraud against the Debtors and their creditors.  The Fallases operated the Fallas SPEs and the Debtors as a single economic enterprise/entity.  Under the multi-factored test for considering whether the corporate veil should be pierced: 1) the Debtors were undercapitalized relative to their corporate undertakings, due to the actions of the Fallases and the diversion of the Debtors' funds to other non-Debtor members of the Fallas Enterprise (in particular, to Fallas SPEs); (2) the Fallases failed to observe corporate formalities between the Debtors and other members of the Fallas Enterprise; (3) the Debtors were insolvent at the time of the self-dealing transactions set forth herein; (4) the Fallases directed the Debtors to pay large dividends at a time when the Debtors were insolvent and already struggling due to, among other things, the stress of the Conway Acquisition; (5) the Fallases repeatedly siphoned funds and assets from the Debtors, including but not limited to through the payment of inflated rents to Fallas SPEs and dividends and other unauthorized payments to Fallas personally; (6) the Fallases appointed themselves as the Debtors' only directors and managers, and Fallas exerted an authoritarian management style with little executive-level input from other personnel (even those nominally titled as executives); (7) Debtor personnel performed work for the Fallases personally and for non-Debtor entities, while being paid by the Debtors; (8) the Fallases used the Debtors as a corporate façade for their individual interests,

92

routinely engaging in unfair transactions that were in violation of the fiduciary duties; and (9) there would be an element of unjustness and/or unfairness in allowing the Fallases and the Fallas SPEs to retain the financial benefits they received through their disregard of the Debtors' corporate form and interests, while saddling the Debtors with liabilities and creditor claims exceeding Two Hundred Million Dollars ($200,000,000.00).

439.    The Trustee requests: (i) a declaratory judgment to the effect that Defendants Michael and Ilanit Fallas (and their respective family trusts) and the Fallas SPEs are to be held jointly and severally liable for all liabilities of the Debtors, including the more than Two Hundred Million Dollars ($200,000,000.00) of outstanding creditor claims; and, (ii) the entry of judgment against Defendants Michael and Ilanit Fallas (and their respective family trusts) and the Fallas SPEs.

## TENTH CLAIM – CIVIL CONSPIRACY
### (Against Michael and Ilanit Fallas and the Fallas SPEs)

440.    Paragraphs 1 through 439, above, are incorporated herein by reference, as if restated in their entirety.

441.    Defendants Michael and Ilanit Fallas and the Fallas SPEs conspired with each other to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty and other wrongs alleged herein.

442.    Defendants Michael and Ilanit Fallas and the Fallas SPEs undertook substantial overt acts, as aforesaid, in furtherance of the conspiracies alleged herein and are liable for the damages and harm to the Debtors.

443.    As a result of the conspiracy among Defendants Michael and Ilanit Fallas and the Fallas SPEs, the Debtors suffered substantial damages for which Defendants Michael and Ilanit Fallas and the Fallas SPEs are jointly and severally liable.

**ELEVENTH CLAIM – CORPORATE WASTE**
**(Against Defendants Michael and Ilanit Fallas)**

444.     Paragraphs 1 through 443, above, are incorporated herein by reference, as if restated in their entirety.

445.     The payments associated with the Conway Acquisition, the Fraudulent Rent Payments to Fallas SPEs, the J & M Sales Dividend and the FP Stores Dividend constituted corporate waste.  They served no rational business purpose and were commercially unreasonable.

446.     As a result of the waste of the Debtors' property, Defendants Michael and Ilanit Fallas are jointly and severally liable for the damages associated therewith.

**VI.     RELIEF REQUESTED**

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of the Debtors, demands judgment in his favor and against the Defendants, jointly and severally where appropriate, for:

(a)     Avoidance and recovery of fraudulent and preferential transfers identified in Counts One, Two, Three, Four, and Six above, or the value thereof;

(b)     Judgment in favor of the Trustee and against the transferee Defendants identified in this Complaint in the amount of the fraudulent and preferential transfers received by each, plus interest thereon;

(c)     Declaratory relief as appropriate;

(d)     Damages in excess of Two Hundred Million Dollars ($200,000,000.00) against Defendants Michael Fallas, Ilanit Fallas, The Michael Fallas Living Trust dated 1/19/05, The Ilanit Fallas Living Trust dated 1/19/05, and the Fallas SPEs;

(e)     Punitive damages in the amount to be determined by the jury;

(f)     Pre-judgment interest, reasonable attorneys' fees, and costs; and

94

(g)     Such additional relief as this Court deems just.

## VII.    **JURY DEMAND**

The Trustee hereby demands a jury trial before an Article III Judge in connection with all

claims asserted herein.

Dated:  July 30, 2020            **GELLERT SCALI BUSENKELL & BROWN, LLC**
       Wilmington, Delaware

                                        */s/ Ronald S. Gellert*
                                        Ronald S. Gellert (No. 4259)
                                        Amy D. Brown (No. 4077)
1201 N. Orange Street, 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5800
Fax: (302) 425-5814
rgellert@gsbblaw.com
abrown@gsbblaw.com

and

**KAUFMAN, COREN & RESS, P.C.**
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Janice I. Daul, Esq.
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Telephone: (215) 735-8700
Facsimile: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jdaul@kcr-law.com

*Counsel for Plaintiff*
*George L. Miller, Chapter 7 Trustee*

# EXHIBIT A

**J&M Sales, Inc., et al.**
**Transfers to Conway Creditors**
**Defendant: KC Exclusive, Inc. d/b/a Zenana**

| Debtor Transferor | Check No. | Check Date | Transfer Date | Transfer Amount |
|---|---|---|---|---|
| Southern Island Stores, LLC | 100347 | 5/13/2014 | 5/22/2014 | $ 133,886.20 |
| **Total Transfers** | | | | **$ 133,886.20** |

**J&M Sales, Inc., et al.**
**Transfers to Conway Creditors**
**Defendant: The Timing, Inc. d/b/a La Vie 89**

| Debtor Transferor | Check No. | Check Date | Transfer Date | Transfer Amount |
|---|---|---|---|---|
| Southern Island Stores, LLC | 100941 | 6/9/2014 | 6/19/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 101501 | 7/10/2014 | 8/25/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 102069 | 8/28/2014 | 8/28/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 102631 | 9/5/2014 | 9/25/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 103214 | 10/10/2014 | 10/27/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 103800 | 11/7/2014 | 11/20/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 104383 | 12/9/2014 | 12/17/2014 | $ 26,041.67 |
| Southern Island Stores, LLC | 104966 | 1/9/2015 | 1/23/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 105544 | 2/10/2015 | 2/23/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 106122 | 3/9/2015 | 3/23/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 106689 | 4/7/2015 | 4/16/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 108401 | 7/13/2015 | 8/10/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 108997 | 8/6/2015 | 9/8/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 109578 | 9/9/2015 | 10/1/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 110169 | 10/9/2015 | 11/10/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 110749 | 11/9/2015 | 11/19/2015 | $ 26,041.67 |
| Southern Island Stores, LLC | 113616 | 4/21/2016 | 5/16/2016 | $ 137,499.95 |
| **Total Transfers** | | | | **$ 554,166.67** |